AFRICAN AMERICAN LEGAL DEFENSE FUND, INC., Mothers on the Move, Inc., Sandra Gonzales, individually and in her capacity as natural mother and legal guardian of the minor children, Michael Mejias and Jonathan Orteza, students of the New York City Public School System, Lillian Sanchez, individually and in her capacity as natural mother and legal guardian of the minor children, Miquel Martinez, Jr. and Edward Martinez, students of the New York City Public School System, Michelle Beverhoudt, individually and in her capacity as natural mother and legal guardian of minor child Frederick Beverhoudt, student of the New York City Public School System, Sandra Credell, individually and in her capacity as natural mother and legal guardian of the minor child Rejeana Credell, student of the New York City Public School System, Plaintiffs,

v.

NEW YORK STATE DEPARTMENT OF EDUCATION, Governor George E. Pataki, New York State Commissioner of Education, Roger P. Mills, Board of Regents, individually and collectively as a Board, Carl T. Hayden, Chancellor, Louise Matteoni, Vice Chancellor, Emlyn I. Griffith, Jorge L. Batista, Edward J. Meyer, Carlos R. Carballada, Mimi Levin Lieber, Norma Gluck, Adelaide L. Sanford, Walter Cooper, Diana O'Neill McGivern, Saul B. Cohen, James C. Dawson, Robert M. Bennett, Robert M. Johnson, and any other successors, H. Carl McCall, Comptroller of the State of New York, Assemblyman Sheldon Silver, Speaker of the Assembly, Senator Joseph L. Bruno, Majority Leader of the Senate, Senator Charles D. Cook, Chair of the Standing Committee on Education, Assemblyman Steven Sanders, Chair of the Assembly Committee on Education, New York City Board of Education, Rudolph F. Crew, Chancellor, Defendants.

No. 95 Civ. 3039(RO).

United States District Court, S.D. New York.

June 8, 1998.

Hartsfield & McFarlane–Vaughn, Joyce Y. Hartsfield, Moya Bramble, Michael Kennedy Lloyd, for plaintiffs.

Dennis C. Vacco, Attorney General for the State of New York, Martin Bienstock, Assistant Attorney General, Scott A. Ziluck, Assistant Attorney General, Paul A. Crotty, Corporation Counsel for the City of New York,

Martha A. Calhoun, Assistant Corporation Counsel, for defendants.

## MEMORANDUM AND ORDER

OWEN, District Judge.

Plaintiff African American Legal Defense Fund is a not-for-profit organization "dedicated to the protection of the legal rights of all people of African Heritage and to the furtherance of the educational opportunities to those of African Heritage".[1] The individual plaintiffs are schoolchildren and the parents of schoolchildren—of Hispanic as well as African–American descent—who attend public schools in New York City. Defendants are officers [2] and agencies of New York State and New York City. Plaintiffs allege that the State's funding of New York City's public schools violates the Education Article and Equal Protection Clause of the New York State Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution,[3] and Section 601 of Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000d, along with its implementing regulations. They also allege a violation of the Voting Rights Act, codified at 42 U.S.C. § 1971 et seq. Defendants move to dismiss the complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state claims upon which relief can be granted.

New York State's system for putting funds into public education is similar to systems used throughout the United States. The State provides local school districts with aid, with local districts raising additional funds through local property taxes. According to statistics alleged by plaintiffs,[4] approximately 53% of the funding for New York City schools comes from local municipal and school district taxes, 5% comes from the fed-

1. Mothers on the Move, a plaintiff named in the caption, is a not-for-profit organization which represents parents of schoolchildren in the Hunts Point–Longwood section of the Bronx. It informed this Court by letter dated May 1, 1997, that it had never consented to be a plaintiff in this case and requested that the Court remove it from the case. That application is granted, *nunc pro tunc*.

2. According to the amended complaint, all of the State officers are sued in their official capacities. However, the amended complaint is silent as to defendant Crew.

3. This claim is brought pursuant to 42 U.S.C. § 1983.

4. For this motion, I accept plaintiff's allegations as true. *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994).

eral government, and 42% comes from the State. Plaintiffs challenge the statutory scheme under which the State portion is distributed to the local districts. Under the State's apportionment system, codified at N.Y.Educ.Law § 3602, aid is distributed to local school districts according to an aggregation of approximately 50 different formulas, encompassing programs including operating aid, extraordinary-needs aid, building aid, and a variety of other grants. Many of the statutory aid formulas include a percentage-equalizing methodology under which the amount of State aid received by each district is determined, in part, by reference to that district's wealth and the district's corresponding ability to obtain school funding on a local level through property taxes. The wealthier the district, the less State aid it receives. For purposes of the percentage-equalizing methodology, the City is considered an average-wealth district.

According to plaintiffs's statistics, a disproportionate number of the minorities in the State attend New York City public schools: approximately 74% of the entire State's minority public school population attend City public schools, and minority children comprise 81% of the City's public school enrollment, compared to 17% outside the City. Plaintiffs' amended complaint states that in 1992–93 New York City schools received an average of $3000 per student in State aid, compared to $3,400 per student for schools in other districts.[5] However, these figures require adjustment in light of plaintiffs' acknowledgment, elsewhere in the amended complaint, that the State allocates and provides aid on the basis of attendance and not enrollment, and plaintiffs' figures spread the State's payments over *all* enrolled students, while the facts is, and plaintiffs affirmatively plead, that New York City schools have a very poor attendance record.[6] Notwithstanding this, plaintiffs claim that the result of said funding system is that City schools, heavily minority, receive less State aid than non-city schools with lesser minority percentages, and the system therefore discriminates against minority students by providing them with less of an opportunity to meet the State's minimum educational standards than their non-minority peers receive.

In addition, plaintiffs challenge the State statutory system by which members of the local school governing boards—New York City's Board of Education and Community School Boards—are selected. By State law, the members of the Board of Education are appointed by the City's mayor and borough presidents. *See* N.Y.Educ.Law § 2590–b(1). In contrast, other cities and towns within the State elect their boards directly. *See, e.g.*, N.Y.Educ.Law § 1702. By State law, the members of the Community School Boards are elected by proportional representation. *See* N.Y.Educ.Law § 2590–c(7).

■ At the outset, the New York City defendants move to dismiss, asserting that plaintiffs' complaint alleges causes of actions only against the State, not the City. At oral argument, plaintiffs admitted as much but claimed that "the city would need to be a necessary party depending on whether or not the Court could fashion a remedy for the plaintiffs". However, the City should not be required to expend its resources defending an action which challenges a state of affairs for which it bears no responsibility.[7] Accordingly, all claims against New York City's Board of Education and Chancellor Rudolph Crew are dismissed.

■ Turning to the New York State defendants, the Eleventh Amendment provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. In *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842

---

5. The sources of these figures is not quite clear, and they are apparently from the 1992–93·school year.

6. This whole subject receives much discussion hereafter.

7. Moreover, since I conclude that none of plaintiffs' claims survives, any issue of remedy is mooted.

(1890), the Supreme Court interpreted the Eleventh Amendment to bar as well actions against a state by a citizen of that same state. Thus, unless a state has consented to be sued, *see Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), or Congress has abrogated state sovereign immunity through a clear and unequivocal statement, *see, e.g., Blatchford v. Native Village of Noatak,* 501 U.S. 775, 786, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991), an action against the state or its agencies will not lie.

■ An exception exists for actions against state officials who act in violation of the Constitution or federal law. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). However, the Supreme Court has held that a federal action does not lie against a state official where it is claimed the state official has violated state law. *See Pennhurst, supra,* at 106, 104 S.Ct. 900.[8] Accordingly, plaintiffs' claims under the Education Article and the Equal Protection Clause of the New York State Constitution are dismissed.

■ Plaintiffs next challenge the State's funding scheme, under 42 U.S.C. § 1983, as violating the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Under established authority, the appropriate standard to be applied to the challenged legislation is rational basis review. "[E]qual protection analysis requires strict scrutiny of a legislative classification *only* when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Board of Retirement v. Murgia,* 427 U.S.

307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (emphasis supplied).[9]

In *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the Supreme Court, addressing an Equal Protection challenge to Texas's statutory scheme for funding its public schools, declined to apply strict scrutiny, observing that a group "unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts", even where the record indicated that the composition of the group was approximately 90% Mexican–American and 6% black, did not constitute a suspect class. *See Rodriguez,* 411 U.S. at 28, 93 S.Ct. 1278. Moreover, the Court held that education was not a fundamental right. *See Rodriguez,* 411 U.S. at 35, 93 S.Ct. 1278. Lastly, the Court held that the Texas statute had a rational relationship to a legitimate state interest. Here, as was true in *Rodriguez,* the legislation at issue does not implicate a suspect class because it distinguishes only on the basis of geographical district, nor, under *Rodriguez,* does it interfere with a fundamental right.[10]

■ The question thus becomes whether New York State's statutory scheme "bears some rational relationship to a legitimate state purpose". *Rodriguez,* 411 U.S. at 44, 93 S.Ct. 1278. Some of the alleged deficiencies of the legislation, such as the absence of provisions for staff development and the failure to foster interagency collaboration, are not grounded in any recognized legal right. Other allegations are merely conclusory. In *Papasan v. Allain,* 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), the Supreme Court, on an appeal from a motion to dismiss

8. Plaintiffs argue erroneously that I may exercise pendent jurisdiction over the state constitutional claims. "[N]either pendent jurisdiction or any other basis of jurisdiction may override the Eleventh Amendment." *Pennhurst,* 465 U.S. at 121, 104 S.Ct. 900.

9. In addition, strict scrutiny is only warranted for an Equal Protection claim where discriminatory intent is alleged. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), *Washington v. Davis,* 426 U.S. 229, 239–42, 96 S.Ct. 2040, 48 L.Ed.2d 597

(1976). As discussed hereafter, there is no allegation of discriminatory intent in the amended complaint. *See* p. 337, *infra.*

10. Even in *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), where the Court considered a challenge to another Texas statute which denied *all* public school benefits to the children of illegal aliens, the Court determined that strict scrutiny was inapplicable, based in part on its holding in *Rodriguez* that education is not a fundamental right. *See Plyler,* 457 U.S. at 223, 102 S.Ct. 2382.

another challenge to a state statute regarding school funding, acknowledged the possibility, left open in *Rodriguez,* that there might be a fundamental right to "a minimally adequate education". *Papasan,* 478 U.S. at 285, 106 S.Ct. 2932. However, the Court found no need to reach that issue, stating:

> Although for purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.... The petitioners do not allege that schoolchildren in the [petitioners' districts] are not taught to read or write; they do not allege that they receive no instruction on even the educational basics; they allege no actual facts in support of their assertion that they have been deprived of a minimally adequate education. As we see it, we are not bound to credit and may disregard the allegation that petitioners have been denied a minimally adequate education.

*Papasan,* 478 U.S. at 286, 106 S.Ct. 2932; *accord Dunn v. Gazzola,* 216 F.2d 709, 711 (1st Cir.1954). The same is true here. Accordingly, I need not address conclusory allegations such as "[d]efendants have failed to create and maintain an equitable education system that provides a sound basic education for all school children...."

■ I turn therefore to plaintiffs' more concrete allegations: that Equal Protection is violated by the provision for attendance-based funding and the statutory hold-harmless provision, which are dealt with in detail hereafter. As a matter of law, this Equal Protection challenge to the State's funding system is governed by *Rodriguez.* Plaintiffs assert that the City has a high proportion of minority students relative to other districts in the state. So too, however, did the districts of the petitioners in *Rodriguez,* where, as observed above, the Court rejected plaintiffs' argument that the geographical districting should be viewed as a suspect classification and held that the Texas scheme satisfied the rational basis standard. *See Rodriguez,* 411 U.S. at 49–55, 93 S.Ct. 1278.

In particular, plaintiffs challenge the statutory formulas which provide for the statewide distribution of aid on the basis of student attendance rather than student enrollment, claiming that such formulas discriminate against the children in poorer districts, where a variety of social and economic factors prevent students from attending school with the regularity that a student from a wealthier district might attend.[11] They allege that distribution according to a per capita, enrollment-based system—regardless of attendance—would result in more aid flowing to City schools. While this latter assertion is obviously true, the State, however, in spending its resources, has an interest in paying only for those students who actually attend. At the outset, I do not see the alleged discrimination in the State funding fully each—but only each—student that actually attends. Moreover, the State has a legitimate interest in providing an incentive for schools to improve attendance rates. Whether the incentive succeeds is irrelevant: the scheme "may not be condemned simply because it imperfectly effectuates the State's goals". *Rodriguez,* 411 U.S. at 51, 93 S.Ct. 1278. The State's legitimate interest is not contradicted and leaves this record with the plaintiffs unable to show the absence of a rational relationship between the statutory provisions for attendance-based distribution and the State's legitimate interest in spending effectively and improving school attendance.

■ Plaintiffs also challenge "hold-harmless" provisions incorporated into certain programs in the State's funding scheme. While noting that many of the school aid formulas include a percentage-equalizing methodology which purports to adjust the amount of State aid so that wealthier districts receive less and less wealthy districts receive more, plaintiffs nevertheless claim that any equalizing effect is undercut by the hold-harmless provisions which provide for a district to receive no less aid in the particular programs to which the provisions applies than it received the year before. However, the obvious purpose of the hold-harmless provisions is to compensate for short-term

---

**11.** It is the impact of these allegations in the complaint on the allegations of disparity of payment that is addressed by this opinion at pp. 333–334, *supra.*

fluctuations in property value that might increase a district's ability to contribute on paper without increasing its liquidity and actual ability to contribute, fluctuations which would otherwise leave a district unable to honor longer-term commitments if local funding unexpectedly declined. Here, too, I see no alleged discrimination in this provision which applies equally to all districts. Again, the uncontradicted assertion of purpose by the State fully supports defendants' argument that plaintiffs cannot show the absence of a rational relationship between the hold-harmless provisions and the State's legitimate interest in preventing fluctuations in assessed property values from causing funding for a particular school district to plummet, with consequent problems honoring prior contracts.

Because plaintiffs, under their Equal Protection Clause claim, can prove no set of facts, consistent with the totality of the allegations in the amended complaint, which would show that the State funding scheme fails rational basis review, the claim is dismissed.

■ I turn next to plaintiffs' claim under Title VI, which provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Under *Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), a disparate impact claim is not cognizable under Title VI; to prevail under Title VI, a plaintiff must make a showing of discriminatory intent. *See Guardians Ass'n,* 463 U.S. at 610–11, 612, 642, 103 S.Ct. 3221; *see also Alexander v. Choate,* 469 U.S. 287, 292–93, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Here, plaintiffs allege as follows:

112. Over the past ten years, despite knowledge of the facts set forth in the preceding paragraphs, and despite recommendations for major reforms in official reports issued by commissions created by the defendants themselves, the defendants have re-enacted the inequitable State aid scheme without substantial modification to address the blatant inequities and their disproportionate impact on minority students, or to ensure that all students throughout the State of New York have available to them the resources necessary to obtain an education meeting or exceeding the Regents' minimum Statewide standards.

113. Defendants have refused to act, even though the detrimental impact of their failure to provide equitable levels of funding on minority students and the effects of segregation were well-recognized and reasonable [sic] foreseeable.

In essence, plaintiffs are claiming that because the State funding scheme's alleged disparate impact on minority students was both known and foreseeable, defendants should be deemed to have acted with discriminatory intent.

Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.

*Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (quotation marks and citations omitted). Thus, plaintiff's amended complaint cannot be read to include an allegation of discriminatory intent. I therefore dismiss plaintiffs' Title VI claim.

■ Next, I must assess plaintiffs' claim as one of disparate impact under the implementing regulations to Title VI. Under *Guardians Ass'n, supra,* agency regulations promulgated under Title VI may provide for a basis of recovery under a disparate impact theory. *See Guardians Ass'n,* 463 U.S. at 584 n. 2, 623 n. 15, 644–45, 103 S.Ct. 3221; *see also Alexander v. Choate,* 469 U.S. 287, 292–93, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). The regulations promulgated by the Department of Education prohibit any recipient of federal funding from

utiliz[ing] criteria or methods of administration which have the effect of subjecting

individuals to discrimination ·because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

34 C.F.R. § 100.3(b)(2).

█ In order to prevail under Title VI's regulations,

A plaintiff ... must make a prima facie showing that the alleged conduct has a disparate impact. Once such a showing has been made, the burden shifts to the defendant to demonstrate the existence of a substantial legitimate justification for the allegedly discriminatory practice. If the defendant sustains this burden, the plaintiff may still prove his case by demonstrating that other less discriminatory means would serve the same objective.

*New York Urban League v. New York,* 71 F.3d 1031, 1036 (2d Cir.1995) (quotation marks and citations omitted). At all times, the burden of persuasion remains on the plaintiff. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (regarding Title VII).[12]

█ I observe that the provisions which plaintiffs attack—the attendance-based funding and the hold-harmless provisions—do not, on their faces, fit the description of "allegedly discriminatory practices". Moreover, as discussed at pp. 336–337, *supra,* substantial legitimate justifications for the aspects of the statutory scheme which plaintiffs challenge are obvious and essentially not disputed. In addition, the enrollment-based alternative which plaintiffs propose for the attendance-based allocation (they propose no alternative for the hold-harmless provisions) is legally insufficient because it fails to meet the objectives served by the existing provision. More to the point, however, plaintiffs' claim here fails at the outset to make a prima facie showing. While the amended complaint asserts an alleged financial disparity between City and non-City students, these statistical allegations are not only questionable, *see* p. 3, *supra,* but also tell only a part of the story of school funding. · They make no reference to the amount of local aid received, which as plaintiffs acknowledge, constitutes 53% of the education funds. Nor do they offer any comparison of the amount of State aid received per *attending* student;[13] if each attending student receives the same amount of aid— and it is the students, not the schools, ·who are the members of minority groups with cognizable interests under Title VI—then there is no disparate impact on minority students.

Of guidance here is *New York Urban League, supra,* in which the district court ruled that a public transportation fare increase had a disparate impact on New York City minorities because it raised intra-city fares by 12.2% and commuter line fares by 2.2%. The Second Circuit reversed, holding that the "farebox recovery ratio" on which the district court had relied did not satisfy the prima facie requirement, the farebox recovery ratio being an "[un]reliable indicator" which "ignores financial reality in an important respect. It does not reveal the extent to which one system might have higher costs associated with its operations—costs stemming from different maintenance requirements, schedules of operation, labor contracts, and so on." *See id.* at 1038.

█ Further, with respect to plaintiffs' claim that the attendance-based system of distribution has a disparate impact on minorities because of such factors as single parenting, poor housing, and medical problems, which contribute to absenteeism among inner-city students, I note that one cannot look to Title VI's regulations for remedy for any alleged disparate impact of this nature, however real and distressing. "Title VI had delegated to the agencies in the first instance the complex determination of what sorts of

---

12. The analytical framework for disparate impact cases under the Title VI regulations is the same as that for Title VII cases. *See, e.g., New York Urban League v. New York,* 71 F.3d 1031, 1036 (2d Cir.1995).

13. Here, again, I assume that plaintiffs' "per student" statistics are based on total student enrollment, regardless of attendance, a reasonable inference in light of the amended complaint's repeated references to the attendance-based distribution scheme.

disparate impacts upon minorities constituted sufficiently significant social problems, and were readily enough remediable, to warrant altering *the practices of the federal grantees that had produced those impacts.*" *Alexander v. Choate,* 469 U.S. 287, 293, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (emphasis supplied). Here, the "grantees" are the school districts, and clearly it is not *their* practices that have produced the absenteeism. Accordingly, Title VI's regulations support no action at law upon those factors.

As for the hold-harmless provisions, applying to all districts, wealthy or not, they hardly merit discussion in this area. They are facially neutral, and plaintiffs have alleged no facts and offered no statistics which might link them to any alleged disparate impact. Their claim under Title VI's regulations is therefore dismissed.

Finally, I turn to plaintiffs' claims under the Voting Rights Act. In their complaint, plaintiffs assert that "The State Governance Plan and The School Community Boards ... as constituted and elected violate the one person one vote rule and such impact is unjustified and therefore violates 42 U.S.C. 1971 of the Voting Rights Act." However, the complaint lacks any specific allegation as to which section of the Voting Rights Act the scheme violates, and the papers shed little light on the issue. I have therefore considered which sections of the Voting Rights Act might be applicable here and whether plaintiffs have stated a claim under those sections.

 The members of New York City's Board of Education are appointed to their positions. Thus, the only section of the Voting Rights Act which might be applicable here is § 5, codified at 42 U.S.C. § 1973c, which concerns the alteration of voting procedures.[14] A shift from a system of election to one of appointments may be subject to this section. *See, e.g., Allen v. State Bd. of Elections,* 393 U.S. 544, 569–70, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). Here, however, the amended complaint is silent as to the history and duration of the appointive system; plaintiffs have neither alleged nor argued that the appointive system replaced an elective one (or certainly not within any relevant recency), which might raise the specter of the deprivation of voting rights.[15] While Rule 8 of the Federal Rules of Civil Procedure requires that I construe the pleadings "so ... as to do substantial justice", Fed.R.Civ.P. 8(f), "[e]ven under the liberal Federal Rules of Civil Procedure, there is a limit to how much a court may be called upon to divine in assessing the sufficiency of the complaint before it, particularly when the plaintiff is represented by counsel." *Heart Disease Research Found. v. Gen. Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972). Because the record contains no allegation that New York City's Board of Education was ever an elected body, that part of plaintiff's claim under the Voting Rights Act which challenges the Board of Education is dismissed.

The members of New York City's Community School Boards are elected through a system of proportional voting.[16] Plaintiffs assert that this system "dilutes the minority voting strength and their ability to elect their own representatives". Thus, plaintiffs may

---

**14.** Although plaintiffs' brief asserts that "the method of appointing impermissible [sic] dilutes minority voting strength", plaintiffs cannot hope to sustain a claim of vote dilution here. Section 2 of the Voting Rights Act, codified at 42 U.S.C. § 1973, which concerns vote dilution, requires a showing "that [the minority group's] members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice". 42 U.S.C. § 1973(b). No such showing can be made in the case of a purely appointive process, which affords no opportunity to *any* member of the electorate to express a choice directly (unless the real target of the claim is the system of election under which the officials with the power to make the appointments are elected, which is not the case here).

**15.** The annotations to the statute which provides for the current system, N.Y.Educ.Law § 2590–b, indicate that an appointive system of some sort has been in place since at least 1961.

**16.** As explained by counsel for the State at oral argument (without contradiction by counsel for plaintiffs), the proportional system works as follows. Each voter has as many votes as there are positions, and the voter ranks his choices. The total number of voters, divided by the number of positions, yields the number of votes needed to elect a candidate. As soon as one candidate has received the requisite number of votes, he is elected. From then on, whenever a ballot lists that candidate as the top choice, the top choice is struck, and the second choice is counted.

**340**

be trying to state a claim of vote dilution, which falls under § 2 of the Voting Rights Act, codified at 42 U.S.C. § 1973.

 In *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court set out the elements of a prima facie case under § 2 of the Voting Rights Act.

> The [Supreme] Court [has] held that, in order to establish unlawful dilution of minority voting strength, or "vote dilution", a plaintiff must show that (1) the minority group "is sufficiently large and geographically compact to constitute a majority in a hypothetical single-member district"; (2) the minority group is "politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances—usually to defeat the minority's preferred candidate."

*NAACP v. City of Niagara Falls*, 65 F.3d 1002, 1007 (2d Cir.1995) (quoting *Thornburg*, 478 U.S. at 50–51, 106 S.Ct. 2752). Even if plaintiffs had alleged that some "white majority" voted as a bloc, which they have not, they have not alleged that the proportional voting scheme facilitates such bloc voting. In fact, as the State points out, the contrary is usually the case, minority advocates favoring proportional voting as a means of insuring minority group representation. Because plaintiffs fail to allege a prima facie case of vote dilution under § 2 of the Voting Rights Act, that part of plaintiff's claim under the Voting Rights Act which challenges the Community School Boards is dismissed.

In sum, for the reasons state above, the complaint is dismissed in its entirety. I do note in this connection that the essence of many of the issues here is presently being heard before appropriate New York State courts with sole jurisdiction to so act. *See Campaign for Fiscal Equity, Inc. v. State* 86 N.Y.2d 307, 631 N.Y.S.2d 565, 655 N.E.2d 661 (1995).

So Ordered.