Cherokee, Lajuan and Mytesha
**ROBINSON, et al.,**
Plaintiffs,

v.

The State of **KANSAS, Bill Graves,**
et al., Defendant.

No. CIV. A. 99–1193MLB.

United States District Court,
D. Kansas.

Sept. 14, 2000.

---

John S. Robb, Somers, Robb and Robb, Newton, KS, Alan L. Rupe, Kelly J. Johnson, Husch & Eppenberger, Wichita, KS, for Plaintiffs.

Emily B. Metzger, Office of U.S. Atty., Wichita, KS, Valerie Simons, U.S. Dept. of Justice, Educational Opportunities Litigation Sec., Washington, DC, for U.S.

Randall L. Manvitz, Gates, Biles, Shields & Ryan, P.A., Overland Park, KS, William Scott Hesse, Office of Atty. Gen., Topeka, KS, for State of Kan., Bill Graves.

Dan Biles, Randall L. Manvitz, Gates, Biles, Shields & Ryan, Overland Park, KS, for Linda Holloway, Andy Tompkins.

## MEMORANDUM AND ORDER

BELOT, District Judge.

Plaintiffs have filed this multi-count complaint against the State of Kansas, its governor, and two education officials,[1] claiming two specific provisions of the State's School District Finance and Quality Performance Act, K.S.A. 72–6405 *et seq.*, create a discriminatory disparate impact against the State's minority students, non-U.S. origin students, and disabled students. Plaintiffs claim the Act's provision for "low enrollment weighting" and "local option budgets" results in less funding per pupil in those schools in which minority, non-U.S. origin and disabled students are disproportionately enrolled. Plaintiffs claim the Act therefore violates Title VI, 42 U.S.C. § 2000d, the Rehabilitation Act of 1973, 29 U.S.C. § 703 *et seq.*, and the plaintiffs' rights to Due Process and Equal Protection under the Fourteenth Amendment.[2] Plaintiffs seek prospective injunctive relief, specifically that the court order defendants to revise Kansas' school finance law to comply with federal law (Doc. 1 at 14).[3]

Defendants move to dismiss plaintiffs' complaint in its entirety. Two separate motions were filed: one on behalf of defendants Holloway and Tompkins (Doc. 12),

1. Defendant Linda Holloway is the chairperson of the Kansas State Board of Education (Doc. 1 ¶ 20). Defendant Andy Tompkins is the commissioner of the Kansas State Department of Education (Doc. 1 ¶ 21).

2. Originally, Unified School Districts Nos. 443 and 305 were named as plaintiffs. Plaintiffs subsequently voluntarily dismissed the school districts. Plaintiffs also voluntarily dismissed their claims under the Kansas Constitution. (Docs. 41 and 44). Throughout plaintiffs' responses to defendants' motions, plaintiffs correct and clarify the claims made in their complaint. For example, only pursuing the constitutional claims against the individual defendants, pursuing claims under 42 U.S.C. § 1983, etc. Plaintiffs have also requested leave to amend their complaint to include a claim under the Americans with Disabilities Act. Plaintiffs shall move to amend their complaint in accordance with this opinion within 10 days of the filing of this order.

3. In their brief opposing defendants' motion, however, plaintiff state they are willing to amend their complaint to state that the injunctive relief they seek is prohibiting defendants from enforcing a state law found to be violative of federal law. In the interest of federal-state comity, the court strongly urges plaintiffs to include such an amendment in a forthcoming motion to amend.

the other on behalf of the State of Kansas and Governor Graves (Doc. 14). All parties incorporate the arguments made in the others' brief (Doc. 13 at 22 n.64; Doc. 15 at 32).

The United States moved to intervene (Doc. 32; Doc. 36 (granting motion)) and filed two amicus curiae briefs opposing defendants' motions (Docs. 34, 35).

## STANDARDS PERTAINING TO A MOTION TO DISMISS

For purposes of a Rule 12(b)(6) motion, the court must assume the truth of all well-pleaded facts in plaintiffs' complaint and view them in a light most favorable to the plaintiffs. *See Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 979, 108 L.Ed.2d 100 (1990); *Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984) ("All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true."). Plaintiffs need only plead minimal factual allegations on those material elements that must be proved. *See Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991). Allegations of conclusions or opinions are not sufficient, however, when no facts are alleged by way of the statement of the claim. *See Bryan v. Stillwater Bd. Realtors,* 578 F.2d 1319, 1321 (10th Cir. 1977). The court must view all reasonable inferences in favor of the plaintiffs, and the pleadings must be construed liberally. *See id.; Lafoy v. HMO Colorado,* 988 F.2d 97, 98 (10th Cir.1993); Fed.R.Civ.P. Rule 8(a).

The court may not dismiss a cause of action for failure to state a claim "unless it appears beyond a doubt that the plaintiff[s] can prove no set of facts in support of the theor[ies] of recovery that would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, Kansas,* 927 F.2d 1111, 1115 (10th Cir. 1991); *Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147, 1148 (10th Cir.1989). The issue is not whether plaintiffs will ultimately prevail on their claims, but whether they are entitled to offer evidence to support their claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

## THE COMPLAINT

Plaintiffs are minority, non-U.S. origin, and disabled students attending school districts in Dodge City and Salina, Kansas (Doc. 1 ¶¶ 1–17). The State funds its school districts pursuant to the School District Finance and Quality Performance Act, Kan. Stat. Ann. 72–6405 *et seq.* The Act sets forth a statutory funding formula under which the State determines the amount of funding allotted to each school district (Doc. 1 ¶ 24). According to plaintiffs' complaint, the State receives federal funds from education programs administered by the federal government and such funds are disbursed to the school districts pursuant to the statutory funding formula (Doc. 1 ¶ 25).

Under the statutory funding formula, each school district receives a set amount of money per student enrolled in the district (Doc. 1 ¶ 26). A statutory base rate is adjusted by several factors, two of which are at issue in this litigation: "low enrollment weighting" and "local option budgets" (Doc. 1 ¶¶ 27, 33). Low enrollment weighting provides additional funds per student in school districts with fewer than 1725 students (Doc. 1 ¶ 27). Additionally, the school funding act permits individual school districts to pass local option budgets to supplement state funding. To do so requires the levying of additional taxes in the district and is sometimes dependent on the approval of residents in the district (Doc. 1 ¶ 33). Plaintiffs claim a "direct correlation exists between the median income and property values in a school district and that district's ability to raise funds through a [local option budget]. School districts with comparatively high median incomes and property values raise more funds through [local option budgets] than those with comparatively low incomes and property values." (Doc. 1 ¶ 33).

Plaintiffs allege minority students, non-U.S. origin students and disabled students

are disproportionately enrolled in comparatively low wealth school districts that are also ineligible for low enrollment weighting. Thus, such students disproportionately receive less funding per pupil on a state-wide basis and, as a result, fewer educational opportunities than white, U.S. origin and non-disabled students (Doc. 1 ¶¶ 28–30, 34–36).

### THE ELEVENTH AMENDMENT

Defendants argue the Eleventh Amendment of the United States Constitution bars plaintiffs' suit.[4] The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court interprets the Amendment to mean that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974).

■ Three exceptions to Eleventh Amendment immunity exist:

First, a state may not assert an Eleventh Amendment defense where Congress has properly abrogated its immunity. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Second, a state may waive its sovereign immunity by consenting to suit in federal court. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 2223, 144 L.Ed.2d 605 (1999). Third, a private party may sue a state officer for prospective injunctive or declaratory relief from an ongoing violation of the Constitution or federal laws. *See Ex parte Young,* 209 U.S.

123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see also Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 2267, 144 L.Ed.2d 636 (1999) (affirming the continuing vitality of *Ex parte Young* ).

*MCI Telecommunications Corp. v. Public Serv. Comm. of Utah,* 216 F.3d 929, 935 (10th Cir.2000).

### A. The State of Kansas as a Defendant

In their response brief, plaintiffs write that "[t]he State of Kansas and Governor Graves can be sued under Title VI and the Rehabilitation Act. Governor Graves and defendants Holloway and Tompkins can be sued under 42 U.S.C. § 1983 on plaintiffs' federal constitutional claims." (Doc. 27 at 4). The court understands plaintiffs' statement to mean that plaintiffs do not wish to pursue their Equal Protection and Due Process claims against the State. The court also notes that in their response to Defendants Holloway and Tompkins' motion to dismiss, plaintiffs request leave to amend their Complaint to include a claim under Title II of the Americans with Disabilities Act (Doc. 31 at 13). For purposes of this opinion, the court will assume plaintiffs intend to pursue this claim against the State and will address such a claim accordingly. *See* discussion, *infra,* at 14.

■ As to defendants' argument that the State is protected from this lawsuit under the Eleventh Amendment, plaintiffs reply that two exceptions to the State's Eleventh Amendment immunity exit. First, plaintiffs argue that by accepting federal funds, the State has waived its sovereign immunity. Second, plaintiffs argue Congress abrogated the State's sovereign immunity by its enactment of 42 U.S.C. § 2000d–7(a)(1). The court will address each of the arguments in turn.

---

**4.** Defendants move to dismiss plaintiffs' complaint under Fed.R.Civ.P. Rule 12(b)(6). An argument that the Eleventh Amendment bars the action, however, is in the nature of a challenge to the court's subject matter jurisdiction and is therefore analyzed under Rule 12(b)(1). *See Elephant Butte Irrigation Dist. v. Dept. of the Interior,* 160 F.3d 602, 607 (10th Cir.1998), *cert. denied,* 526 U.S. 1019, 119 S.Ct. 1255, 143 L.Ed.2d 352 (1999).

### 1. Title VI

#### a. Waiver by accepting federal funds

Plaintiffs argue the State waived its Eleventh Amendment immunity as to Title VI by accepting federal educational funds. A state may waive its Eleventh Amendment immunity in one of two ways. First, a state may voluntarily invoke the jurisdiction of a federal court. *See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 119 S.Ct. 2219, 2226, 144 L.Ed.2d 605 (1999). This has not occurred here. Second, a state waives its immunity if it "makes a clear declaration that it intends to submit itself to [a federal court's] jurisdiction." *Id.* (internal quotation marks and citation omitted). The test for determining whether a waiver has occurred is "a stringent one." *Id.* A state may make such a "clear declaration" in one of two ways: expressly and impliedly. A state may expressly waive its immunity through a state statute or constitutional provision. *See In re Innes*, 184 F.3d 1275, 1278 (10th Cir.1999), *cert. denied*, — U.S. ——, 120 S.Ct. 1530, 146 L.Ed.2d 345 (2000).[5] A state may impliedly waive its immunity so long as the implied declaration is clear and "altogether voluntary." *See College Sav. Bank*, 527 U.S. at 679, 119 S.Ct. at 2228; *MCI Telecommunications*, 216 F.3d at 935. A waiver is voluntary only when Congress threatens a state with the denial of a "gift or gratuity." *See College Sav. Bank*, 527 U.S. at 686, 119 S.Ct. at 2231. On the other hand, if Congress threatens a state

with a "sanction" for such a refusal, the waiver is not truly voluntary. See *id.*[6]

As an illustration of what constitutes a "gift or gratuity," the Court discussed its decision in *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). *See College Sav. Bank*, 527 U.S. at 686, 119 S.Ct. at 2231. *Dole* involved South Dakota's constitutional challenge of a federal statute's conditioning states' receipt of federal highway funds on adoption of a minimum drinking age of 21. *See Dole*, 483 U.S. at 205, 107 S.Ct. at 2795. The Court held "that Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions." *College Sav. Bank*, 527 U.S. at 686, 119 S.Ct. at 2231 (citing *Dole* ).

Congress' power to condition a state's receipt of federal funds on its waiver of Eleventh Amendment sovereignty is incident to its powers under the Spending Clause of Article I, § 8, clause 1. *See Dole*, 483 U.S. at 207, 107 S.Ct. at 2796. This power is substantial and Congress may accomplish "objectives not thought to be within Article I's 'enumerated legislative fields.'" *Id.* (quoting *United States v. Butler*, 297 U.S. 1, 66, 56 S.Ct. 312, 80 L.Ed. 477 (1936)). Such a waiver, however, requires an "unequivocal indication" that a state has consented to federal jurisdiction, either " 'by the most express language or by such overwhelming implications from the text as [will] leave no room

---

**5.** In *In re Innes*, the Tenth Circuit determined that neither a Kansas statute, nor a Kansas constitutional provision expressly waived the state's Eleventh Amendment immunity. *See Innes*, 184 F.3d at 1278–79. There is no claim that such a waiver has occurred in this case.

**6.** The Supreme Court, in *College Savings Bank*, added that a gift may become a sanction if the "gift," threatened to be withheld, is large. *See id.* at 685, 119 S.Ct. at 2231. Defendants, in their reply brief, occasionally use the buzz word "coercion" in what the court assumes is an attempt to argue this

point. The court, however, finds this argument lacking because defendants do not even try to explain how the State's receipt of the federal education funds is so large as to cross the threshold point mentioned in *College Savings*. Furthermore, the Tenth Circuit has recently observed that this "coercion theory," discussed in *College Savings Bank*, was merely dicta. *See MCI Telecommunications Corp. v. Public Serv. Comm. of Utah*, 216 F.3d 929, 938–39 n. 6 (10th Cir.2000). The Tenth Circuit has also opined that "the coercion theory is unclear, suspect, and has little precedent to support its application." *Kansas v. United States*, 214 F.3d 1196, 1202 (10th Cir.2000).

for any other reasonable construction.'" *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974) (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909)). A federal statute must manifest a "clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 247, 105 S.Ct. 3142, 3149–50, 87 L.Ed.2d 171 (1985).

#### b.  42 U.S.C. § 2000d–7

■ 42 U.S.C. § 2000d–7 provides that "[a] State shall not be immune under the Eleventh Amendment ... from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance."[7]  42 U.S.C. § 2000d–7(a)(1). Defendants make no argument that the State of Kansas has not received federal education funds. Thus, the question is "whether [42 U.S.C. § 2000d–7] provide[s] unambiguously that [the State], by agreeing to receive federal education funds under Title [IV], has waived its Eleventh Amendment immunity." *Litman v. George Mason Univ.,* 186 F.3d 544, 551 (4th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1220, 145 L.Ed.2d 1120 (2000).

The Supreme Court has noted that by enacting section 2000d–7, "Congress sought to provide the sort of unequivocal waiver" the Court's opinion in *Atascadero* demanded. *See Lane v. Pena,* 518 U.S. 187, 198, 116 S.Ct. 2092, 2099, 135 L.Ed.2d 486 (1996). The Eleventh Circuit has concluded that § 2000d–7(a)(1)'s "plain language manifests an unmistakable intent to condition federal funds on a state's waiver of sovereign immunity" under Title VI. *See Sandoval v. Hagan,* 197 F.3d 484, 493 (11th Cir.1999), *petition for cert. granted,* —— U.S. ——, 121 S.Ct. 28, 147 L.Ed.2d 1051 (2000). Furthermore, all but one of the courts of appeals that have considered whether the language in § 2000d–7 waives a state's immunity once the state receives federal funds, have decided the issue in the affirmative. *See Litman,* 186 F.3d at 551 (concluding § 2000d–7 conditions a state's receipt of Title IX funds on an unambiguous waiver of Eleventh Amendment immunity); *Stanley v. Litscher,* 213 F.3d 340, 344 (7th Cir.2000) (determining "Rehabilitation Act is enforceable in federal court against recipients of federal largess"); *Little Rock School Dist. v. Mauney,* 183 F.3d 816, 831–32 & n. 12 (8th Cir.1999) (characterizing as "an unambiguous waiver of immunity" a parallel provision under the IDEA's § 1403); *Clark v. California,* 123 F.3d 1267, 1271 (9th Cir.1997) (determining that § 2000d–7(a)(1) manifests a clear intent to condition a state's receipt of federal funds under the Rehabilitation Act on its consent to waive its Eleventh Amendment immunity).[8] The only opinion to conclude other-

---

**7.** Section 2000d–7 was enacted pursuant to the Rehabilitation Act Amendments of 1986 in response to the United States Supreme Court decision *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), in which the Court held that Congress had not unmistakably expressed its intent to abrogate the States' Eleventh Amendment immunity under the Rehabilitation Act. *See Lane v. Pena,* 518 U.S. 187, 197–98, 116 S.Ct. 2092, 2099, 135 L.Ed.2d 486 (1996). The effective date of the amendment was October 21, 1986. *See* 42 U.S.C. § 2000d–7(b).

**8.** The Tenth Circuit has not yet had the opportunity to decide whether § 2000d–7 is suffi-

cient to waive a state's immunity under Title VI or the Rehabilitation Act. The court has merely noted that it is "aware" of the decisions holding that § 2000d–7 is indeed sufficient. *See In re Innes,* 184 F.3d 1275, 1282 (10th Cir.1999). In *Innes,* Kansas State University entered into a contract with the Department of Education to participate in the federal Perkins Loan program. *See id.* at 1277. That agreement explicitly provided that KSU agreed to abide by specific department regulations. *See id.* at 1281–82. The court concluded this specific agreement waived KSU's Eleventh Amendment immunity. *See id.* at 1282.

wise is *Bradley v. Arkansas Dept. of Ed.,* 189 F.3d 745, 757–58 (8th Cir.1999). That portion of the opinion, however, has been vacated and reheard *en banc. See Jim C. v. Arkansas Dept. of Ed.,* 197 F.3d 958 (8th Cir.1999) (argued Jan. 14, 2000).

In their reply brief, defendants make what the court assumes to be a generalized federalism argument with respect to plaintiffs' theory of implied waiver of immunity. The Tenth Circuit has recently addressed such an argument from the State of Kansas in a case involving Kansas' challenge to the conditions imposed under a congressional act on the State's acceptance of federal welfare funds:

> Kansas has invited us to forge new ground in Spending Clause jurisprudence by invalidating the child support enforcement conditions Congress attached to its social welfare funding program. In doing so, it asks that we expand the concept of "coercion" as it applies to relations between the state and federal governments, and find a large federal grant accompanied by a set of conditional requirements to be coercive because of the powerful incentive it creates for the states to accept it. We decline the invitation. In this context, a difficult choice remains a choice, and a tempting offer is still but an offer. If Kansas finds the IV–D requirements so disagreeable, it is ultimately free to reject both the conditions and the funding, no matter how hard that choice may be.... Put more simply, Kansas' options have been increased, not constrained, by the offer of more federal dollars.

*Kansas v. United States,* 214 F.3d 1196, 1203–04 (10th Cir.2000).

■ Defendants argue that because the funds alleged to be distributed in a discriminatory fashion are not the actual federal funds disbursed to the State spoken of in Title VI, Congress' conditioning receipt of the federal funds on the state's waiver of immunity is unconstitutional. In *South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987), however, the

United States Supreme Court explained that for a condition to be a permissible congressional exercise under the Spending Clause, the conditions should be merely *related* " 'to the federal interest in particular national projects or programs.' " *See id.* at 207, 107 S.Ct. at 2796 (quoting *Massachusetts v. United States,* 435 U.S. 444, 461, 98 S.Ct. 1153, 1164, 55 L.Ed.2d 403 (1978) (plurality opinion)). No dollar-for-dollar accounting need be made.

■ Title VI prohibits discrimination "under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI defines "program or activity" as "the entity of such State or local government that distributes such assistance and each such department or agency ... to which the assistance is extended, in the case of assistance to a State or local government." *Id.* at § 2000d–4a(B). The regulations apply to the State of Kansas because the state receives federal funds from the Department of Education. *See* 34 C.F.R. § 100.2 (1999). The discrimination prohibited is discrimination in education. *See id.* at § 100.3(2). The court finds the condition and the federal interest are sufficiently related to be constitutional. *See also Kansas v. United States,* 214 F.3d 1196, 1200 (10th Cir.2000) (noting the lack of any recent Supreme Court decisions invalidating a congressional funding condition and listing the several Supreme Court decisions upholding conditions placed on the receipt of federal funds).

Plaintiffs further argue the Eleventh Amendment is no bar to their Title VI claim against the State of Kansas because Congress abrogated the state's immunity by its enactment of 42 U.S.C. section 2000d–7. Defendants respond that although Congress has unequivocally expressed its intent to abrogate the states' immunity for Title VI claims, Congress was not acting pursuant to a valid exercise of power. Neither the United States Supreme Court, nor the Tenth Circuit has decided whether Congress's abrogation

was a valid exercise of power under section 5 of the Fourteenth Amendment. Because the court has determined the State of Kansas, by accepting federal funds, has effectively waived its Eleventh Amendment immunity, the court need not address the issue of abrogation. *Cf. Martin v. Kansas,* 190 F.3d 1120, 1126 (10th Cir.1999) (stating that because the state did not waive its immunity under the ADA, the court must determine whether Congress permissibly abrogated the state's immunity).

## 2. Rehabilitation Act

■ As with their Title VI claim, plaintiffs argue the State of Kansas waived its Eleventh Amendment immunity under § 504 of the Rehabilitation Act by accepting federal funds. For the same reasons 42 U.S.C. § 2000d–7 properly conditioned the state's acceptance of federal funds to its waiver of immunity under Title VI, § 2000d–7 also conditioned the receipt of such funds on the state's waiver of its immunity to a Rehabilitation Act claim. Furthermore, as with the Title VI claim, because the court determines the state's immunity is waived with respect to such claim, the court need not address whether Congress properly abrogated the state's immunity. *See J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1287 (10th Cir.1999) ("Furthermore, as the Eleventh Amendment poses no bar to any claim in this action, we need not address whether . . . Section 504 of the Rehabilitation Act . . . contain[s a] valid statutory abrogation[ ] of Eleventh Amendment immunity under § 5 of the Fourteenth Amendment.").

## 3. Americans with Disabilities Act

■ In their response to the motion to dismiss by defendants Holloway and Tompkins, plaintiffs request leave to amend their Complaint to assert a claim under the Americans with Disabilities Act (Doc. 31 at 13). Should plaintiffs do so, the court assumes, for purposes of this motion to dismiss, that plaintiffs would wish to assert such a claim against the State of Kansas. In that case, the Eleventh Amendment would be no bar because the Tenth Circuit has recently decided Congress properly abrogated the states' immunity from suit under the ADA. *See Martin v. Kansas,* 190 F.3d 1120, 1128 (10th Cir.1999) (holding the ADA was a permissible exercise of Congress' Fourteenth Amendment, Section 5 enforcement powers).[9]

## B. The Individual Defendants in their Official Capacity

■ As plaintiffs and amicus point out, even in the absence of either waiver or valid abrogation, plaintiffs may maintain their action against the individual defendants in their official capacity under the doctrine of *Ex parte Young. See Elephant Butte Irrigation Dist. v. Dept. of the Interior,* 160 F.3d 602, 607 (10th Cir.1998) (citing *Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). The *Ex parte Young* doctrine is not an exception to the Eleventh Amendment, but rather is a judicially created legal fiction in which the lawsuit is against state officials, not the state. *See Elephant Butte,* 160 F.3d at 607. Al-

---

9. The court notes, however, the Third and Seventh Circuits have come to the opposite conclusion. *See Lavia v. Dept. of Corrections,* 224 F.3d 190, ——, 2000 WL 1121553 at *1 (3d Cir.2000); *Erickson v. Board of Governors for N.E. Ill. Univ.,* 207 F.3d 945, 952 (2000), *petition for cert. filed,* —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 69 U.S.L.W. 3003 (U.S. June 26, 2000) (No. 99–2077). The Third Circuit decided its case in light of the recent Supreme Court decision *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) in which the Court

held the Age Discrimination in Employment Act was not a valid exercise of Congress' § 5 enforcement power and, therefore, did not validly abrogate the States' Eleventh Amendment immunity. The Third Circuit recognized the Tenth Circuit's contrary conclusion, but noted that *Martin* was decided pre-*Kimel. See Lavia,* 224 F.3d at 202, & n. 3. *But see Davis v. Utah State Tax Comm'n,* 96 F.Supp.2d 1271, 1279–84 (D.Utah 2000) (reasoning the court is not only bound by Tenth Circuit precedent in *Martin,* but that *Kimel* would not change the result).

though a state official, named in his or her official capacity is considered to be acting on behalf of the state and thus is immune from suit under the Eleventh Amendment, *see Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985), *Ex parte Young* "creates a narrow exception to this general rule." *Elephant Butte*, 160 F.3d at 607. The Eleventh Amendment does not bar a suit against a state official in federal court which seeks only prospective equitable relief for violations of federal law. *See id.* at 607–08 (citing *Ex parte Young*, 209 U.S. at 159–60, 28 S.Ct. at 454).[10]

Defendants do not argue against the continuing validity of the *Ex parte Young* doctrine,[11] but rather contend that plaintiffs' lawsuit implicates special state sovereignty issues and is accordingly barred under the recent United States Supreme Court decision *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997).[12] *Coeur d'Alene* limited the *Ex parte Young* doctrine in that the Court held that prospective injunctive relief may also be barred by the Eleventh Amendment when such relief would be as much of an intrusion on state sovereignty as an award of money damages. *See ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1190 (10th Cir.1998), *cert. denied*, 525 U.S. 1122, 119 S.Ct. 904, 142 L.Ed.2d 902 (1999) (citing *Coeur d'Alene Tribe* ).

Subsequently, the Tenth Circuit interpreted the *Coeur d'Alene Tribe* opinion to impose a new requirement into an *Ex parte Young* analysis. *See id.* The Tenth Circuit observed that the federal courts must first "examine whether the relief being sought against a state official implicates special sovereignty interests." *Id.* (internal quotation omitted). "If so, [the court] must then determine whether that requested relief is the functional equivalent to a form of legal relief against the state that would otherwise be barred by the Eleventh Amendment." *Id.* (internal quotation omitted). To this effect, the Tenth Circuit stated that a federal court "must not extend the *Ex parte Young* doctrine to allow a suit for prospective equitable relief when that relief would be just as intrusive, if not more so, into core aspects of a state's sovereignty." *Id.*

---

10. The Tenth Circuit recently explained the application of the *Ex Parte Young* doctrine:

> [W]hen a suit names a state official as the defendant, the Eleventh Amendment still bars the action if "the state is the real, substantial party in interest." Whether the state is the real party in interest turns on the relief sought by the plaintiff. Suits that seek prospective relief are deemed to be suits against the official, while suits that seek retroactive relief are deemed to be suits against the state.

*Powder River Basin Resource Council v. Babbitt*, 54 F.3d 1477, 1483 (10th Cir.1995) (quoting *Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945)).

11. Indeed, the United States Supreme Court has recently affirmed the doctrine by stating that it does not "question the continuing validity of the *Ex parte Young* doctrine." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269, 117 S.Ct. 2028, 2034, 138 L.Ed.2d 438 (1997).

12. Defendants State of Kansas and Governor Graves' brief in support of their motion is somewhat difficult to follow. In section I.B.1.b.i, defendants appear to argue the *Ex parte Young* doctrine is inapplicable because "plaintiff's [sic] are not seeking to prevent Governor Graves, in his official capacity, from future violations of the Fourteenth Amendment. The plaintiff's [sic] are asking the Governor to rewrite the school finance law of the State of Kansas." (Doc. 15 at 19). Defendants then cite as authority *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) and *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1188 (10th Cir.1998) for the proposition that a federal court cannot instruct a state official on how to conform their conduct to *state* law. (Doc. 15 at 20). The organization of defendants' brief confuses the court because these are two entirely different arguments. In any event, the arguments of *Pennhurst* and *ANR Pipeline* are moot because plaintiffs have agreed to voluntarily dismiss their state constitutional claims. (Doc. 27 at 14 n.9). To the extent defendants argue the court cannot order the individual defendants to do an affirmative act, the court finds such an argument to be more appropriately addressed *infra* under the Tenth Amendment section.

Defendants State of Kansas and Governor Graves' unnecessarily long and verbose argument can be summarized to be that the State's ability to finance its school system (or, as defendants put it, "to write its laws allocating its resources to train the future leaders of this state" (Doc. 15 at 22)) implicates a "special sovereignty interest." Thus, say defendants, not even the legal fiction of *Ex parte Young* can save plaintiffs' lawsuit. The court does not agree.

In support of their argument, defendants rely extensively on *Coeur d'Alene Tribe* and *ANR Pipeline v. Lafaver.* In *Coeur d'Alene Tribe,* the tribe sought a declaratory judgment against the state establishing its right to quiet enjoyment of Lake Coeur d'Alene. *See Coeur d'Alene Tribe,* 521 U.S. at 264–65, 117 S.Ct. at 2032. The tribe also sought prospective injunctive relief against various state officials to prevent them from exercising any regulatory jurisdiction over the lake. *See id.* at 265, 117 S.Ct. at 2032. A majority of the fractured court agreed the *Ex parte Young* doctrine could not save the tribe's suit. *See id.* at 287–88, 117 S.Ct. at 2043 (Kennedy, J., majority opinion). The majority instead determined that the tribe's requested relief would be the "functional equivalent" of a quiet title action against the state which would "implicate[ ] special sovereignty interests." *Id.* at 281, 117 S.Ct. at 2040 (Kennedy, J., majority opinion). In so doing, the Court took pains to detail the doctrines of state sovereignty over navigable waters, going as far back as Justinian's *Institutes.* The Court reviewed the importance over such a law from the English common law to the importation of that law into the American legal system. *See id.* at 284–85, 117 S.Ct. at 2041–42.

In *ANR Pipeline v. Lafaver,* 150 F.3d 1178 (10th Cir.1998), *cert. denied,* 525 U.S.

1122, 119 S.Ct. 904, 142 L.Ed.2d 902 (1999), the Tenth Circuit, relying on *Coeur d'Alene Tribe,* found that the state's power to assess and levy personal property taxes on property located within its borders implicated special sovereignty interests. *See id.* at 1193. Accordingly, the court barred the plaintiffs from not only requesting damages for prior alleged wrongs, but also from seeking a declaratory judgment and an injunction requiring Kansas to recertify the plaintiffs' property valuations for past and future tax years. *See id.* at 1194. The court determined that such relief would be " 'fully as intrusive' into the state's sovereignty as would be a retroactive money judgment against excessive property taxes." *Id.* The court reasoned the plaintiffs' request that the court "rewrite Kansas' property tax code" would undermine the state's sovereign interest because "it is impossible to imagine that a state government could continue to exist without the power to tax." *Id.* at 1193–94.[13]

Defendants' reliance on the findings of *Coeur d'Alene Tribe* and *ANR Pipeline* is misplaced because, as subsequent courts have noted, those opinions were "inextricably bound to the specific facts of the case." *Glazer's Wholesale Drug Co. v. Kansas,* 92 F.Supp.2d 1228, 1233 (D.Kan.2000). In the Tenth Circuit, a finding of a "special sovereignty interest" is limited to "those situations that strike at the heart of the state's ability to function." *Id.*

On many occasions since *ANR Pipeline,* the Tenth Circuit has limited its holding to the facts of the case. In *Buchwald v. Univ. of New Mexico Sch. of Medicine,* 159 F.3d 487 (10th Cir.1998), the plaintiff, claiming the state university unconstitutionally denied her admission based on residency, sought prospective injunctive relief ordering her admission to the medi-

---

**13.** It should be noted that in *ANR Pipeline* the court found the plaintiffs' request for future tax relief preempted by the Tax Injunction Act, 28 U.S.C. § 1341, which requires all constitutional challenges to state taxation be heard in state court. *See ANR Pipeline,* 150

F.3d at 1191–92 (citing *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) for holding that *Ex parte Young* can not be used to expand plaintiffs' remedies beyond those set by Congress).

cal school. *See id.* at 492. The court, although recognizing the recent limitations imposed on the *Ex parte Young* doctrine by *Coeur d'Alene Tribe* and *ANR Pipeline,* determined the limitations did not apply. *See id.* at 495 n. 6. In doing so, the court reasoned "[t]here is certainly no threat that the New Mexico government would cease to exist without [the university's] disputed policy." *Id.*

In *Elephant Butte Irrigation Dist. v. Dept. of the Interior,* 160 F.3d 602 (10th Cir.1998), *cert. denied,* 526 U.S. 1019, 119 S.Ct. 1255, 143 L.Ed.2d 352 (1999), the court decided that New Mexico's property interest in the right to profits from a land lease did not constitute a special sovereignty interest. *See id.* at 612. In *Branson Sch. Dist. RE–82 v. Romer,* 161 F.3d 619 (10th Cir.1998), *cert. denied,* 526 U.S. 1068, 119 S.Ct. 1461, 143 L.Ed.2d 546 (1999), the Tenth Circuit rejected the defendants' *Coeur d'Alene Tribe* argument, finding instead that the plaintiffs' requested relief would merely affect only a limited aspect of how the state managed public lands. *See id.* at 632–33. Specifically, the court stated it found it "impossible to say that the distinction between, for example, whether a state must manage its school lands to maximize revenues as opposed to managing the land to produce consistent income over time is a distinction that implicates special sovereignty interest." *Id.* at 632.

The Tenth Circuit later found that a state's control over its employees was not a special sovereignty interest and affirmed the trial court's direction to state officials to reinstate a state employee who had sued under 42 U.S.C. § 1981. *See Ellis v. Univ. of Kansas Med. Ctr.,* 163 F.3d 1186, 1198 (10th Cir.1999). The court distinguished the facts of that case from the facts of both *Coeur d'Alene Tribe* (sover-

eign control over lands) and *ANR Pipeline* (state's power to assess and levy personal property taxes on property within its borders). *See id.*

More recently, and under facts more analogous to those at hand, the Tenth Circuit stated "[a] state's interest in administering a welfare program at least partially funded by the federal government is not such a core sovereign interest as to preclude the application of *Ex parte Young.*" *J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1287 (10th Cir.1999). In a footnote, the court noted that the defendants "only fleetingly mention that this lawsuit affects the state's sovereignty to administer its various child welfare programs and provide no argument or reasoning why this interest should enjoy special status." *Id.* at 1287 n. 3.

Like the defendants in *Valdez,* defendants in this case cling to the specific holdings of *Coeur d'Alene Tribe* and *ANR Pipeline* and urge the court to find the state's ability to fund its school districts is a "special sovereign interest." The court cannot do so. Subsequent cases in this circuit make clear the finding of such an interest in *Coeur d'Alene Tribe* and *ANR Pipeline* was the exception rather than the rule. Although defendants argue "a state could [not] continue to exist without the power to write its own laws without the supervision of the federal courts," (Doc. 15 at 23), the court disagrees. As in *Valdez,* the state's school financing is partially funded by the federal government. The state could indeed continue to exist while a federal court examines whether the state is distributing funds in a non-discriminatory manner in compliance with federal laws.[14] The court, accordingly, finds the *Coeur d'Alene Tribe* exception to the doctrine of *Ex parte Young* inapplicable and

---

14. Furthermore, even if the court could find a "special sovereign interest," (which it cannot), *Coeur d'Alene Tribe*'s exception to *Ex parte Young* would still not be applicable because defendants make no argument as to the second inquiry under *ANR Pipeline.* The Tenth Circuit, in *ANR Pipeline,* made clear

that *Coeur d'Alene Tribe*'s exception applies only when 1) a special sovereign interest is involved *and* 2) the requested relief is the "functional equivalent" to a quiet title action, divesting the state of all sovereign control over land within its borders. *See ANR Pipeline,* 150 F.3d at 1190.

therefore plaintiffs may proceed with their lawsuit and seek prospective injunctive relief against the individual defendants in their official capacity.

### GOVERNOR BILL GRAVES AS A PROPER DEFENDANT

■ Defendants next argue Governor Bill Graves should be dismissed from the lawsuit because, as an individual, he is not the proper person to effectuate plaintiffs' requested relief. Specifically, defendants argue that "[a]lthough Bill Graves has been sued in his official capacity as Governor of the State of Kansas for prospective injunctive relief, he is still a person and not an entity." (Doc. 15 at 24). Not so.

In *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court stated that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Id.* at 71, 109 S.Ct. at 2312 (citing *Brandon v. Holt*, 469 U.S. 464, 471, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985)). The real party in interest in an official capacity suit is the governmental entity and not the named official. *See Hafer v. Melo*, 502 U.S. 21, 24, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991). Suits against an individual in his or her official capacity " 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114 (1985) (quoting *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978)).

In their response brief, plaintiffs mention that they are willing to amend their complaint's prayer for relief to include injunctive relief prohibiting defendants from violating plaintiffs' rights under Title VI, the Rehabilitation Act, the ADA, and the

Fourteenth Amendment (Doc. 27 at 15). Under the Kansas Constitution, the Governor of Kansas is responsible for the enforcement of the laws of Kansas. *See* Kan. Const. art. I, § 3. If allowed, plaintiffs' amended complaint will, in essence, be asking that the Governor be prohibited from enforcing a Kansas law, specifically the school financing statute, in a way found by this court to be unconstitutional or in violation of a federal statute. The governor is the proper party to this action. *Cf. Brown v. Bd. of Ed. of Topeka*, 892 F.2d 851, 887 (10th Cir.1989) (finding proper the dismissal of governor because lawsuit did not implicate the enforcement of any state statute).

### SERVICE ON GOVERNOR BILL GRAVES

■ Defendants argue the court does not have personal jurisdiction over the Governor because he was not properly served. Defendants contend that because the Governor has been sued in his official capacity, the suit is one against the state and under the applicable federal rule and Kansas statute, service should have been made on the attorney general's office. Plaintiff answers that not only was the Governor personally served, but that service was made at the office of the attorney general as well.

The Governor, whether sued in his individual or official capacity, is an individual. Thus service upon him was proper when he was served personally. *See* Fed. R.Civ.P. Rule 4(e)(1) and (2); Kan. Stat. Ann. 60–304(a). Service was proper. In any event, defendants should be aware that Kansas law provides that substantial compliance with the service of process statute is sufficient. *See* Kan. Stat. Ann. 60–204;[15] *see also Pedi Bares, Inc. v. P & C Food Markets, Inc.*, 567 F.2d 933, 936

---

15. "In any method of serving process, substantial compliance therewith shall effect valid service of process if the court finds that, notwithstanding some irregularity or omission, the party served was made aware than an action or proceeding was pending in a specified court in which his or her person, status or property were subject to being affected." Kan. Stat. Ann. 60–204.

(10th Cir.1977); *Brin v. Kansas*, 101 F.Supp.2d 1343, 1347 (D.Kan.2000).

### DISPARATE IMPACT CLAIM UNDER TITLE VI

■ Defendants argue plaintiffs' Title VI claims should be dismissed because plaintiffs "cannot show the challenged statutory provisions inflict a significant and unique adverse impact solely on them because of their membership in a protected group." (Doc. 12 at 9). Recognizing plaintiffs' claim is one of disparate impact, defendants argue plaintiffs fail to state a claim because 1) the facts alleged fail to make out a case of causation (Doc. 12 at 11); 2) any alleged inequities apply with equal force to the non-minority students in the districts at issue (Doc. 12 at 13); and 3) the alleged inadequacies in the funding to their districts is not *because of* their protected status (Doc. 12 at 11). Defendants' arguments, however, fail to recognize the nature of a disparate impact claim, a claim recognized by the Tenth Circuit under Title VI.

Section 601 of Title VI of the Civil Rights Act of 1964 provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Although the Supreme Court has recognized an implied private cause of action under section 601, *see Alexander v. Choate*, 469 U.S. 287, 293–94, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985); *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 607 n. 27, 103 S.Ct. 3221, 3235 n. 27, 77 L.Ed.2d 866 (1983), the Court has also held that to state such a claim, a plaintiff must establish the funding recipient's discriminatory intent. *See Alexander*, 469 U.S. at 293, 105 S.Ct. at 716. *See also United States v. Fordice*, 505 U.S. 717, 732 n. 7, 112 S.Ct. 2727, 2737–38 n. 7, 120 L.Ed.2d 575 (1992); *Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1405–06 n. 11 (11th Cir.1993).

Section 602 of Title VI empowers agencies providing federal financial assistance to issue "rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance...." 42 U.S.C. § 2000d–1. The Supreme Court has held that such agencies have the authority to promulgate regulations pursuant to Section 602 which prohibit funding recipients from taking any action that *results* in a disparate impact or produces discriminatory effects on the basis of race, color, or national origin. *See Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 584 n. 2, 103 S.Ct. 3221, 3223 n. 2, 77 L.Ed.2d 866 (1983) (White, J.); *Id.* at 623 n. 15, 103 S.Ct. at 3244 n. 15 (Marshall, J.); *Id.* at 642–45, 103 S.Ct. at 3253–55 (Stevens, Brennan, Blackmun, JJ.); *see also Alexander*, 469 U.S. at 293, 105 S.Ct. at 716. The Department of Education has promulgated such a regulation:

A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided ... may not ... utilize criteria or methods of administration **which have the effect of** subjecting individuals to discrimination because of their race, color, or national origin, **or have the effect of** defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

34 C.F.R. § 100.3(b)(2) (1999) (emphasis added).

Although the Supreme Court has yet to decide whether a private right of action exists under the regulation, *see Sandoval v. Hagan*, 197 F.3d 484, 504 (11th Cir. 1999), *petition for cert. granted*, —— U.S. ——, 121 S.Ct. 28, 147 L.Ed.2d 1051 (2000), the Tenth Circuit recognizes the regulation as prohibiting actions having a disparate impact and as providing a private right of action. *See Villanueva v. Carere*, 85 F.3d 481, 486 (10th Cir.1996).

*See also Edwards & Assocs., Inc. v. Black & Veatch, L.L.P.*, 84 F.Supp.2d 1182, 1194–95 n. 20 (D.Kan.2000).

Defendants argue dismissal of plaintiffs' Title VI claim is appropriate because plaintiffs cannot show the state's funding of the school districts inflicts a "unique" adverse impact "because of" their minority status. In essence, defendants argue that because non-minority students also attend the school districts in which plaintiffs are enrolled and plaintiffs receive the same funding per student as the non-minority students, plaintiffs are unable to prove a disparate impact claim. The court agrees with plaintiffs that defendants' argument "misstates the fundamental nature of disparate impact discrimination." (Doc. 31 at 5).

"To survive a motion to dismiss, all that the plaintiff must do is plead that a facially neutral practice's adverse effects fall disproportionately on a group protected by Title VI." *Powell v. Ridge*, 189 F.3d 387, 394 (3d Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999). In this case, plaintiffs have pled:

1. Under the Act's funding formula, each public school district receives a set amount of money per student enrolled in the district. (Doc. 1 ¶ 26).
2. Public school districts with fewer than 1725 students receive additional funds per student pursuant to low enrollment weighting. (Doc. 1 ¶ 27).
3. Minority students are disproportionately enrolled in mid-size and large school districts which do not qualify for low enrollment weighting and, as a result, receive less funding per student. (Doc. 1 ¶ 28).
4. The Act permits individual school districts to pass local option budgets to supplement state funding. A direct correlation exists between the median income and property values in a school district and that district's ability to raise funds through an LOB. (Doc. 1 ¶ 33).
5. Minority students are disproportionately enrolled in school districts with comparatively low incomes and property values. These districts collect fewer funds through LOBs than districts which enroll disproportionate numbers of white students. (Doc. 1 ¶ 34).

Plaintiffs have pled their disparate impact claim by stating that minority students are disproportionately enrolled in districts which receive less funding per students due to the Act's provision for low enrollment weighting and local option budgets. It does not make sense, then, to compare plaintiffs to the non-minority students enrolled in the same districts as plaintiffs. The comparison must be made to the other districts, state-wide. Plaintiffs have adequately pled a disparate impact claim.

Embedded within their first argument, defendants briefly argue plaintiffs' Title VI claims should be dismissed because plaintiffs have failed to carry their burden of persuasion (Doc. 12 at 11). Although the Tenth Circuit has not spoken on the various burdens in the context of a Title VI disparate impact claim, the courts of appeals to have decided the issue have generally agreed that the burdens should follow those developed in Title VII cases. *See Powell*, 189 F.3d at 393 (citing cases). In *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301 (10th Cir.1999), the Tenth Circuit discussed the burden shifting analysis of a disparate impact claim under Title VII. *See id.* at 1312. The court found the plaintiff presented sufficient evidence of a material issue of fact with respect to her prima facie case by presenting statistical information. *See id.* at 1313–14. Accordingly, the court reversed the district court's grant of the defendant's motion for summary judgment. *See id.* at 1315.

Defendants point out plaintiffs fail to prove any facts to support their allegations of disparate impact. Defendants' motion, however, is one for dismissal, not summary judgment. "The burden a Title VI plaintiff must meet to survive a motion to dismiss ... is much less onerous." *Powell*, 189 F.3d at 394. For purposes of a motion to dismiss, "[a]ll well-pleaded facts and allegations in the complaint must be taken as true and the complaint should not be

dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *S.A.I., Inc. v. General Elec. Railcar Servs.,* 935 F.Supp. 1150, 1152 (D.Kan.1996) (internal quotation omitted). Plaintiffs should be allowed to proceed to gather and offer evidence in support of their claims. Defendants' argument is more appropriately addressed in a motion for summary judgment.

■ Defendants further argue plaintiffs' claimed disparate impact cannot serve as a basis for their claims because these "societal ills" are not caused by the State's school funding system (Doc. 12 at 12). In their complaint, plaintiffs allege the funding system disproportionately and adversely impacts minorities in that the state spends less money on them, *causing* disproportionately high dropout rates, a disproportionate number of violent acts at school and disproportionately low pass rates and standardized test scores (Doc. 1 ¶¶ 40, 46). Defendants argue dismissal is appropriate because "these societal ills do not result from Kansas' school funding system." (Doc. 12 at 12).

In support of their argument, defendants cite *African American Legal Defense Fund, Inc. v. New York State Dept.,* 8 F.Supp.2d 330 (S.D.N.Y.1998). In *African American,* the plaintiff challenged a school funding system that based the funding a district would receive on attendance, rather than enrollment. *See id.* at 334. The plaintiffs alleged this adversely affected minorities because minorities had a higher rate of absenteeism. *See id.* at 338. The plaintiffs alleged the higher rate of absenteeism could be *attributed* to minori-

ties having a higher rate of single parenting, poor housing, and medical problems. *See id.* It was in this context the district court found dismissal appropriate because the school districts were not causing the absenteeism and it was the absenteeism which was causing certain school districts to receive less money per enrolled student. *See id.* at 339.

Unlike the complaint in *African American,* plaintiffs in this case allege that the "societal ills" are *caused* by the way the State funds the school districts. For purposes of a motion to dismiss, such an allegation suffices for pleading disparate impact. Whether plaintiffs can indeed prove such societal ills do exist and whether they exist in disproportionate numbers in the districts at issue is better addressed in a motion for summary judgment.

### § 504 OF THE REHABILITATION ACT OF 1973

**A. Administrative Exhaustion under the IDEA**

As an initial matter, the court must determine whether the claims of the disabled plaintiffs must be dismissed on the ground these students failed to exhaust their administrative remedies under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.[16]

The IDEA requires states to provide the parents of disabled students the right to seek review of any decision concerning their child's education. *See* 20 U.S.C. § 1415. Parents have the right to "present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or **the**

---

16. The IDEA sets forth a comprehensive educational scheme and requires each state receiving federal education funds to design an individualized education program ("IEP") for each disabled child. *See Honig v. Doe,* 484 U.S. 305, 311–12, 108 S.Ct. 592, 597–98, 98 L.Ed.2d 686 (1988). *Honig* analyzed the act when it was titled the Education of the Handicapped Act. *See Honig,* 484 U.S. at 309, 108 S.Ct. at 596. In 1990, the name was changed to the IDEA. *See* Pub.L. No. 101–476, 104 Stat. 1141 (1990). The IEP is a written statement for each child with a disability which sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, evaluation criteria and procedures to determine whether the child has met the goals. *See* 20 U.S.C. § 1414(d)(1)(A). Federal funding is conditioned upon a state's compliance with the IDEA's extensive substantive and procedural requirements. *See id.* at § 1412.

provision of a free appropriate public education to such child." *Id.* at § 1415(b)(6) (emphasis added). Parents then are entitled to an impartial due process hearing conducted by a state or local educational agency. *See id.* at § 1415(f)(1). If the hearing was conducted by a local educational agency, the parent is entitled to an appeal to the state educational agency. *See id.* at § 1415(g). Only after exhaustion of these procedures may the parent seek review in federal or state court. *See id.* at § 1415(i)(2)(A).

Defendants argue the claims of the disabled plaintiffs must be dismissed because they did not exhaust their administrative remedies under the IDEA. Subsection (*l*) of 20 U.S.C. § 1415 provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, **except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.**

*Id.* at § 1415(*l*) (emphasis added).[17] Thus, although the IDEA is not the exclusive avenue for the disabled plaintiffs to enforce their rights, defendants argue exhaustion of the IDEA's administrative procedures is a prerequisite to their bringing their federal claims in district court.

Assuming Kansas is a state which has subjected itself to the requirements of the IDEA, the court is not persuaded the disabled plaintiffs are precluded from bringing their claims without first seeking administrative review under the IDEA. In *Association for Community Living in Colorado v. Romer,* 992 F.2d 1040 (10th Cir.1993), the Tenth Circuit established three exceptions to IDEA's exhaustion requirement: 1) when administrative exhaustion would be futile; 2) when it would fail to provide adequate relief; and 3) when "an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law." *See id.* at 1044 (quoting H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985)). Plaintiffs argue that because they allege systemic violations of the federal statutes and seek state-wide reforms, they are excused from the administrative exhaustion requirement.

"Administrative remedies are generally inadequate or futile where plaintiffs allege structural or systemic failure and seek systemwide reforms." *Romer,* 992 F.2d at 1044. As the Ninth Circuit Court of Appeals has observed, however, "what constitutes a systemic failure is not so easily defined." *Doe v. Arizona Dept. of Ed.,* 111 F.3d 678, 681 (9th Cir.1997). In *Romer,* the plaintiffs alleged the Colorado Department of Education's policies regarding extended school days and extended school

---

**17.** Subsection (*l*) was added by Congress in response to the United States Supreme Court decision *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) in which the Court limited a disabled student's remedies to those provided under the then-called Education of the Handicapped Act. *See Smith,* 468 U.S. at 1019, 104 S.Ct. at 3472. Recognizing *Smith* precluded parents from bringing special education cases under the Rehabilitation Act, *see* S. Rep. No 112, 99th Cong., reprinted in 1986 U.S.C.A.A.N 1799–1800, Congress acted "swiftly, decisively, and with uncharacteristic clarity to correct what it viewed as judicial misinterpretation of its intent." *Fontenot v. Louisiana Bd. of Elementary and Secondary Ed.,* 805 F.2d 1222, 1223 (5th Cir.1986). Congress then passed the Handicapped Children's Protection Act of 1986, P.L. 99–372, 100 Stat. 796, which added subsection (*l*). Congress stated this subsection was added to "reestablish statutory rights repealed by the U.S. Supreme Court in *Smith* and to 'reaffirm, in light of this decision, the viability of section 504 [of the Rehabilitation Act]', 42 U.S.C. [section] 1983, and other statutes as separate vehicles for ensuring the rights of handicapped children." H.R.Rep. No. 296, 99th Cong., 1st Sess. 4 (1985); S.Rep. No. 112, 99th Cong. 2nd Sess. 2–3, *reprinted in* 1986 U.S.C.A.A.N. 1798, 1799–1800.

years discriminated against disabled students in violation of the IDEA and the Equal Protection Clause. The Tenth Circuit held the plaintiffs' failure to exhaust was not excused because the violations alleged and the relief requested targeted not structural or due process concerns, but the effect of a single component of the state's educational program on individual children. *See Romer,* 992 F.2d at 1043–45. In *Urban v. Jefferson County School Dist. R–1,* 89 F.3d 720 (10th Cir.1996), the court held a disabled child was required to exhaust administrative remedies for his challenge to the IEP developed by his school district because his claims directed at a single IEP were not systemic. *See id.* at 725.

Unlike the plaintiffs in *Romer* and *Urban,* the disabled plaintiffs in the instant action do not challenge a state education department's policy or a school district's development of a particular IEP. Instead, plaintiffs seek to have a state statute held to be in violation of federal law. The House Report, relied on by the Tenth Circuit in *Romer* for the exceptions to exhaustion, explained:

> [T]here are certain situations in which it is not appropriate to require the use of due process and review procedures set out in [20 U.S.C. § 1415] of the [IDEA] before filing a law suit.
> These include complaints that:(1) it would be futile to use the due process procedures ...; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies (**e.g., the hearing officer lacks the authority to grant the relief sought**)....

H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985) (emphasis added).

In *Monahan v. Nebraska,* 645 F.2d 592 (8th Cir.1981), the plaintiff claimed a Nebraska statute violated the Education for All Handicapped Children Act of 1975. The Eighth Circuit held he was not required to first exhaust his administrative

remedies because his "claim that the state procedure on its face conflicts with the Federal Act could not be addressed effectively by the state administrative process." *Id.* at 597. Similarly, in *Kerr Center Parents Ass'n v. Charles,* 897 F.2d 1463 (9th Cir.1990), the Ninth Circuit held exhaustion of administrative remedies was not required because the plaintiff sought funds which the state legislature had not provided. The court explained "the problem posed by the legislature's failure to appropriate sufficient funds is not one which could have been effectively addressed through the administrative process." *Id.* at 1470.

Like the plaintiffs in *Monahan* and *Kerr,* the disabled plaintiffs in this case challenge the school funding systems in Kansas as set forth in the School District Finance and Quality Performance Act, Kan. Stat. Ann. 72–6405 *et seq.* Thus, the remedies plaintiffs seek address state legislation and not a mere policy of the state's education department or a particular IEP. Adherence to the administrative procedures under the IDEA would be unable to address plaintiffs' claims. Therefore, administrative exhaustion would be futile and is accordingly excused.

**B. Disparate Impact Claim under § 504**

Defendants move to dismiss plaintiffs' Rehabilitation Act claim on the grounds that 1) the alleged inequities in Kansas' school districts do not occur *solely* on account of plaintiffs' disabilities, 29 U.S.C. § 794(a); and 2) plaintiffs fail to allege defendants acted in bad faith or with gross misjudgment. Both of defendants' arguments fail. The first fails because it is not supported by any Tenth Circuit precedent. The second fails because it has been expressly rejected by Tenth Circuit precedent.

Count III of plaintiffs' complaint alleges Kansas' school funding act has a disproportionate adverse impact on disabled students in violation of the Rehabilitation Act

of 1973, 29 U.S.C. § 701 *et seq.* (Doc. 1 at 11). According to the complaint, disabled students are disproportionately enrolled in school districts which have low local option budgets and receive fewer funds per pupil from the state. This disparate impact, plaintiffs allege, causes disabled students to have "inferior access to education programs, facilities and transportation, all of which would improve the quality of their education and which are disproportionately available to non-disabled students." (Doc. 1 at 11).

### 1. 29 U.S.C. § 794(a)

Section 504 of the Rehabilitation Act states: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.... " 29 U.S.C. § 794(a). To make out a prima facie case, a plaintiff must prove (1) he is handicapped under the Act; (2) he is "otherwise qualified" to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminated against him. *See Powers v. MJB Acquisition Corp.,* 184 F.3d 1147, 1151 (10th Cir.1999); *Woodman v. Runyon,* 132 F.3d 1330, 1337 (10th Cir.1997). The statute "constitutes an across-the-board requirement of nondiscrimination in all federally assisted programs[,]" including recipients of federal funds for education. *New Mexico Ass'n for Retarded Citizens v. New Mexico,* 678 F.2d 847, 852 (10th Cir.1982).

In *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), the Supreme Court compared the competing interests in whether or not to allow disparate impact claims under the Rehabilitation Act. *See id.* at 295–99, 105 S.Ct. at 717–19. The Court discussed at length the legislative history of the Act and Congress's clear intention to prohibit more than just intentional discrimination of the handicapped. *See id.* at 295–97, 105 S.Ct. at 717–18 ("Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect."). On the other hand, the Court contemplated the impracticality of allowing any and all disparate impact claims under the Act. *See id.* at 298–99, 105 S.Ct. at 718–19 ("Because the handicapped typically are not similarly situated to the nonhandicapped, respondents' position would in essence require each recipient of federal funds first to evaluate the effect on the handicapped of every proposed action that might touch the interests of the handicapped, and then to consider alternatives for achieving the same objectives with less severe disadvantage to the handicapped."). With that discussion of the "two powerful but countervailing considerations[,]" the Court declined the opportunity to decide whether disparate impact claims exist under the Rehabilitation Act. *See id.* at 299, 105 S.Ct. at 719.

In a footnote, the Court noted the Tenth Circuit recognizes disparate impact claims under the Rehabilitation Act. *See id.* at 297 n. 17, 105 S.Ct. at 718 n. 17 (citing *New Mexico Ass'n for Retarded Citizens v. New Mexico,* 678 F.2d 847, 854 (10th Cir.1982) and *Pushkin v. Regents of Univ. of Colorado,* 658 F.2d 1372, 1384–85 (10th Cir. 1981)). In *New Mexico,* the Tenth Circuit expressly rejected the defendants' argument that disparate treatment of handicapped individuals is a prerequisite to finding discrimination under Section 504. *See New Mexico,* 678 F.2d at 854. The court stated:

> We find no language in the statute or regulations suggesting that proof of disparate treatment is essential to establishing a Section 504 infraction in connection with the educational rights of handicapped children. The handicapped by definition demand vastly different learning programs than the nonhandicapped. Accordingly, the State's disparate treatment argument is rejected.

*Id.* The *New Mexico* court relied in part on the Tenth Circuit's previous Section 504 case, *Pushkin,* for its decision. *See id.* In *Pushkin,* the court noted:

> [i]t would be a rare case indeed in which a hostile discriminatory purpose or subjective intent to discriminate solely on the basis of handicap could be shown. Discrimination on the basis of handicap usually results from more invidious causative elements and often occurs under the guise of extending a helping hand or a mistaken, restrictive belief as to the limitations of handicapped persons. A claim under § 504 would be analyzed more readily under a "disparate impact" theory where it is claimed that a facially neutral practice has a discriminatory impact on persons within a protected class.

*Pushkin,* 658 F.2d at 1385 (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). Thus, this court, following Tenth Circuit precedent, finds plaintiffs' disparate impact claim cognizable under Section 504 of the Rehabilitation Act. *But see Crocker v. Runyon,* 207 F.3d 314, 321 (6th Cir.2000) ("There is good reason to believe that a disparate impact theory is not available under the Rehabilitation Act.").

Nevertheless, defendants argue dismissal is appropriate because plaintiffs fail to allege that the denial of benefits is due *solely* because of plaintiffs' disabilities. Defendants reason that "even assuming the alleged inequities exist, they occur only because of the school districts' characteristics and not because of these plaintiffs' disabling conditions." (Doc. 1 at 15). Defendants fail to elaborate on what exactly they mean by "school districts' characteristics," but the court assumes they mean the characteristics which, under the current Kansas school financing act, causes such school districts to receive less funding per student. As with defendants' Title VI argument, defendants once again misconstrue a disparate impact claim.

In support of their argument, defendants rely on the words "solely by reason of his or her disability" in the language of Section 504. (Doc. 12 at 14–15). Defendants reason that plaintiffs suffer the alleged inequities in school benefits, not because of their disability, but because they happen to attend school districts that, under the Kansas school financing act, receive less funding per pupil. But that is exactly the essence of plaintiffs' disparate impact claim. Plaintiffs allege disabled and handicapped students are disproportionately enrolled in school districts whose "characteristics" cause the districts to receive less funding per student under the Kansas financing act. Of course defendants can argue the reason plaintiffs suffer the inequities is because they attend such school districts. But to grant dismissal of plaintiffs' claim on such an argument would be the equivalent to stating that a disparate impact claim is not cognizable under the Act, a position the Tenth Circuit does not take.

Defendants do not cite to any Tenth Circuit opinions for their argument that the statute's language "solely by reason of" limits a plaintiff's claim of disparate impact under the Rehabilitation Act. Defendants do cite a D.C. Circuit opinion, *Crandall v. Paralyzed Veterans of America,* 146 F.3d 894 (D.C.Cir.1998). *Crandall,* however, involved a single employee's suit against his former employer after the employee was terminated for "multiple acts of rudeness to fellow employees and outside groups." *See id.* at 895. The plaintiff claimed a disability, manic depression, caused his rudeness and therefore his termination was in violation of Section 504. *See id.* His employer, however, had neither actual nor constructive notice of his disability when it fired him. *See id.* Thus, the court found the Rehabilitation Act did not cover the plaintiff's termination because the plaintiff could not prove he was fired *solely by reason of* his disability. Specifically, the court stated:

> In any event, § 504 prohibits only discriminatory acts performed "solely by reason of" the plaintiff's handicap. The

courts of appeals have overwhelmingly agreed that for this causal link to be shown the employer must have acted with an awareness of the disability itself, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability.

*Id.* at 896–97. The above-cited language is simply inapplicable to a disparate impact claim.

### 2. *Bad Faith*

[19] Defendants next argue plaintiffs' § 504 claim should be dismissed because plaintiffs have failed to allege defendant acted with bad faith or gross misjudgment (Doc. 12 at 15). Pleading bad faith, however, is not required because plaintiffs do not ask for compensatory damages.

In *Pushkin v. Regents of Univ. of Colorado,* 658 F.2d 1372 (10th Cir.1981), the defendants argued that the trial court's finding they did not act in bad faith required the court to rule in their favor on the Section 504 claim. *See id.* at 1384. The Tenth Circuit disagreed. Although the court recognized that bad faith or a discriminatory intent is required for an Equal Protection claim, *see id.* (citing *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)), such a requirement could not be imputed into the language of the Rehabilitation Act. *See id.* Recently, the Tenth Circuit held that a plaintiff must plead and prove intentional discrimination in order to receive compensatory damages. *See Powers v. MJB Acquisition Corp.,* 184 F.3d 1147, 1153 (10th Cir.1999). By negative implication, then, it can be assumed the court was also stating that intent need not be pleaded nor proved if the plaintiff does not seek such a monetary award.

In support of their argument that a claim under the Rehabilitation Act requires an allegation of bad faith, defendants rely on language of an Eighth Circuit opinion, *Monahan v. Nebraska,* 687 F.2d 1164 (8th Cir.1982). In *Monahan,* however, the alleged defective state law had, prior to the appeal, been cured and therefore the plaintiff's claim for prospective injunctive relief was held moot. *See id.* at 1169. The plaintiff argued his claim for damages under the Rehabilitation Act was not mooted. *See id.* It was in this context that the Eighth Circuit stated that *liability* under the Act required a showing of bad faith or gross misjudgment. Specifically, the court stated that it did "not read § 504 as creating general tort liability for educational malpractice...." *Id.* at 1170.[18]

In their reply brief, defendants offer three additional arguments warranting dismissal of plaintiffs' Rehabilitation Act claim (Doc. 41 at 7). The court will not address new arguments in a reply brief. *See State Farm Fire & Cas. Co. v. Mhoon,* 31 F.3d 979, 984 n. 7 (10th Cir.1994); *Headrick v. Rockwell Int'l Corp.,* 24 F.3d 1272, 1277–78 (10th Cir.1994); *Codner v. United States,* 17 F.3d 1331, 1332 n. 2 (10th Cir.1994). Furthermore, defendants do not support their arguments with any authority. Failure to press a point by supporting it with pertinent authority forfeits the point. *See Phillips v. Calhoun,* 956 F.2d 949, 953–54 (10th Cir.1992).

### *EQUAL PROTECTION AND DUE PROCESS*

Plaintiffs' counts IV and V claim Kansas' school funding act violates their Fourteenth Amendment rights to Equal Protection and Due Process. Defendants move to dismiss these claims arguing plaintiffs

---

**18.** Furthermore, as plaintiffs point out, at least one federal district court has opined that the language of *Monahan* is no longer good law in light of the 1986 amendments to the Education of the Handicapped Act. *See Howell v. Waterford Public Schools,* 731 F.Supp. 1314, 1318 (E.D.Mich.1990). *See also* discus-

sion, *supra,* note 17. The court, however, notes that the Eighth Circuit has recently reaffirmed *Monahan*'s "bad faith or gross misjudgment" language in a case involving a plaintiff's claim for damages. *See Heidemann v. Rother,* 84 F.3d 1021, 1032 (8th Cir.1996).

have not sufficiently alleged they have been deprived of a fundamental right and, as a matter of law, the challenged provisions of the state act bear a rational relationship to a legitimate state purpose. The court agrees that the "rational relationship" standard governs plaintiffs' claims (as opposed to a heightened standard of review). Dismissal at this point, however, would be inappropriate.

In their complaint, plaintiffs allege Kansas' school financing act violates their right to equal protection because the act "treats similarly situated students differently, depending on the number of students enrolled in their school districts and the relative wealth of those school districts." (Doc. 1 ¶ 57). Plaintiffs also claim the act deprives them of substantive due process rights (Doc. 1 ¶ 62). Plaintiffs' complaint alleges defendants lack a rational basis for setting the low enrollment weighting threshold at 1725 students or for the state's "abdicat[ing] its constitutional duty to provide suitable funding for public school" through the local option budgeting. (Doc. 1 ¶¶ 59, 63).

■ Under the Equal Protection Clause, "if a law neither burdens a fundamental right nor targets a suspect class, [the court] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996).[19] Plaintiffs argue not that Kansas' school financing law targets a suspect class, but instead that their right to a "minimally adequate education" is a fundamental right. If plaintiffs are correct, the court must apply a heightened scrutiny of the state act. On the other hand, if plaintiffs have failed to allege the deprivation of a fundamental right, the court need only decide whether Kansas' act bears a rational relationship to a legitimate state purpose.

Plaintiffs have alleged that the Kansas school financing act has caused the state "to fail to provide a suitable education for all public school students" (Doc. 1 ¶ 67). Thus, plaintiffs argue, the state has failed to provide them with a "minimally adequate education," a fundamental right under the United States Constitution (Doc. 1 ¶ 58). Although the Supreme Court has left open the question of whether the right to a minimally adequate education is a fundamental right, warranting a heightened level of scrutiny, the court finds plaintiffs have failed to sufficiently allege the deprivation of such a right.

In *Papasan v. Allain*, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), the Supreme Court stated it had "not yet definitively settled the questions whether a minimally adequate education is a fundamental right and whether a statute alleged to discriminatorily infringe that right should be accorded heightened equal protection review." *Id.* at 285, 106 S.Ct. at 2944. The Court, however, found that the case did not require it to settle the question. The plaintiffs, in their complaint, simply

---

**19.** Similarly, the Due Process Clause "also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997). If the right asserted is not a fundamental one, the Clause only requires the state law "be rationally related to legitimate government interests." *Id.* at 728, 117 S.Ct. at 2271. Although defendants argue *Rodriguez* dictates dismissal of both plaintiffs' Equal Protection and Due Process claims, both their and plaintiffs' arguments center around precedent discussing only Equal Protection claims. However, as will be discussed below, because a fundamental right has not been sufficiently

alleged, both claims require application of the rationally related standard. Thus, the court finds it appropriate that discussion of the Due Process claim is subsumed in the court's analysis of the Equal Protection claim. The parties are warned, however, such an analysis is only appropriate for purposes of this motion to dismiss. In a later stage of this litigation, such as a motion for summary judgment, the parties must do a better job at distinguishing between the two separate claims. Plaintiffs are warned that if they do not do a better job at defending their Due Process claim in a more specific manner, the court will consider the claim abandoned and will dismiss it accordingly.

and conclusively alleged they had been denied a minimally adequate education without supporting such an allegation with any facts. Although the case was before the Court on the defendants' motion to dismiss under Rule 12(b)(6), the Court stated it could disregard the plaintiffs' allegation and simply apply the rational relationship standard. Specifically, the Court stated:

> Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.... The petitioners' allegation that, by reason of the funding disparities relating to the Sixteenth Section lands, they have been deprived of a minimally adequate education is just such an allegation. The petitioners do not allege that schoolchildren in the Chickasaw Counties are not taught to read or write; they do not allege that they receive no instruction on even the educational basics; they allege no actual facts in support of their assertion that they have been deprived of a minimally adequate education. As we see it, we are not bound to credit and may disregard the allegation that the petitioners have been denied a minimally adequate education.

*Id.* at 286, 106 S.Ct. at 2944 (citations omitted).

In this case, plaintiffs make the bare allegation that "[a] minimally adequate education is a fundamental right under the United States and Kansas Constitutions." (Doc. 1 ¶ 58). In their response to defendants' motion, plaintiffs point out that under the Complaint's Count VI, the now voluntarily dismissed claim under the Kansas Constitution, they allege the State of Kansas has failed to provide them suitable funding, which they argue is the equivalent of the denial of a minimally adequate education (Doc. 31 at 16). Even so, plaintiffs still have failed to allege the facts necessary, under *Papasan*, in order to receive a heightened standard of review under their Equal Protection claim. Thus, like the Court in *Papasan*, this court will apply the

"rationally related" standard. "The differential treatment alleged here constitutes an equal protection violation only if it is not rationally related to a legitimate state interest." *Id.* at 286, 106 S.Ct. at 2945.

That being so, defendants argue plaintiffs' equal protection claim should be dismissed because, as a matter of law, the State has a legitimate purpose in its established school funding policy. Furthermore, defendants argue, federal courts should pay deference to a state's decisions on its own educational policy. Defendants assert that the Supreme Court's decision in *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) is controlling and the court must dismiss plaintiffs' claim.

In *Rodriguez*, the parents of Mexican–American children in an urban San Antonio school district challenged Texas's system of financing its public schools. Under that system, schools were funded from mainly two sources. Half of the funds came from a state program. *See id.* at 9, 93 S.Ct. at 1283. The rest of the funds came from a local property tax. *See id.* at 9 n. 21, 93 S.Ct. at 1284 n. 21. The plaintiffs claimed the system, because of varying wealths of the areas in which the school districts were located, created "substantial interdistrict disparities" throughout the state. *See id.* at 15, 93 S.Ct. at 1287.

Applying the rational relationship standard to the parents' equal protection challenge, *see id.* at 44, 93 S.Ct. at 1302, the Court determined Texas' system constitutional. *See id.* at 55, 93 S.Ct. at 1308. In doing so, the Court stated:

> It has simply never been within the constitutional prerogative of this Court to nullify statewide measures for financing public services merely because the burdens or benefits thereof fall unevenly depending upon the relative wealth of the political subdivision in which citizens live.

*Id.* at 54, 93 S.Ct. at 1307–08.

Thirteen years later, however, the Court made clear that its holding in *Rodriguez*

was not meant to declare constitutional, as a matter of law, all funding variations that might result from a State's public school funding policy. *See Papasan v. Allain,* 478 U.S. 265, 287, 106 S.Ct. 2932, 2945, 92 L.Ed.2d 209 (1986). Rather, Justice White, writing for a majority of the court, clarified that *Rodriguez* "held merely that the variations that resulted from allowing local control over local property tax funding of the public schools were constitutionally permissible in that case." *Id.* (footnote omitted). *Papasan* involved claims by the school children and school officials of 23 Mississippi counties that the state's unequal distribution of funds from "Sixteenth Section or Lieu Lands" created a disparity between the plaintiffs' and other schools. *See id.* at 265–75, 106 S.Ct. at 2935–2939. The Court of Appeals for the Fifth Circuit affirmed the district court's dismissal of the plaintiffs' Equal Protection claim, reasoning that *Rodriguez* controlled the decision. *See id.* at 275, 106 S.Ct. at 1938–39. The Supreme Court, however, disagreed and reversed:

To begin with, we disagree with the Court of Appeals' apparent understanding of the crux of the petitioners' claim. As we read their complaint, the petitioners do not challenge the overall organization of the Mississippi public school financing program. Instead, their challenge is restricted to one aspect of that program: The Sixteenth Section and Lieu Lands funding. All of the allegations in the complaint center around disparities in the distribution of these particular benefits, and no allegations concerning disparities in other public school funding programs are included.

Consequently, this is a very different claim than the claim made in *Rodriguez*. In *Rodriguez*, the contention was that the State's overall system of funding was unconstitutionally discriminatory. There, the Court examined the basic structure of that system and concluded that it was rationally related to a legitimate state purpose. In reaching that conclusion, the Court necessarily found that funding disparities resulting from differences in local taxes were acceptable because related to the state of allowing a measure of effective local control over school funding levels. *Rodriguez* did not, however, purport to validate all funding variations that might result from a State's public school funding decision. It held merely that the variations that resulted from allowing local control over local property tax funding of the public schools were constitutionally permissible in that case.

Here, the petitioners' claim goes neither to the overall funding system nor to the local ad valorem component of that system. Instead, it goes solely to the Sixteenth Section and Lieu Lands portion of the State's public school funding. And, as to this claim, we are unpersuaded that *Rodriguez* resolves the equal protection question in favor of the State. The allegations of the complaint are that the State is distributing the income from Sixteenth Section lands or from lieu lands or funds unequally among the school districts, to the detriment of the Chickasaw Cession schools and the students.... This case is therefore very different from *Rodriguez*, where the differential financing available to school districts was traceable to school district funds available from local real estate taxation, not to a state decision to divide state resources unequally among school districts. The rationality of the disparity in *Rodriguez*, therefore, which rested on the fact that funding disparities based on differing local wealth were a necessary adjunct of allowing meaningful local control over school funding, does not settle the constitutionality of disparities alleged in this case, and we differ with the Court of Appeals in this respect.

*Id.* at 286–88, 106 S.Ct. at 2945–46 (footnotes omitted).

*Rodriguez* and *Papasan,* read together, dictate that dismissal of an equal protection claim is appropriate to a challenge of a state's allowing funding disparities attributable to variations of wealth and resulting taxes of the different school districts. *Papasan,* however, makes clear that when the state's actions go a step further, that

is, when the state actually disburses funds to the school districts, in unequal amounts, dismissal under Rule 12(b)(6) is not appropriate. Although the court must still apply the "rational relationship" standard to the claim, a standard tough for a plaintiff to meet, the court cannot find as a matter of law that it can never be met.

Plaintiffs' complaint attacks two specific provisions of the Kansas school funding act. Plaintiffs first attack the Kansas Act's adjustment of the base rate of funding, referred to as "low enrollment weighting," whereby the state disburses additional funds to school districts with fewer than 1725 students (Doc. 1 ¶ 27). Plaintiffs also attack the Act's provision allowing the individual school districts to pass "local option budgets" to supplement funding received from the State (Doc. 1 ¶ 33). According to the complaint, this type of supplemental funding "requires the levying of additional taxes and is sometimes dependant on the approval of residents of the district." (Doc. 1 ¶ 33). It is plaintiffs' contention that school districts in areas of comparatively high median incomes and property values raise more funds through the local option budget than those comparatively low median incomes and property values (Doc. 1 ¶¶ 24–26).

Because the two provision of the Kansas Act are different, the two provisions receive different treatment for purposes of defendants' motion to dismiss. Plaintiffs' attack on the low enrollment weighting is governed by *Papasan*, while their attack on the local option budgets is governed by *Rodriguez*. The low enrollment weighting is a disbursement of funds from the State to the different school districts. The allegation that the State is disbursing these funds in unequal amounts to the different school districts is analogous to Mississippi's unequal distribution of funds from the Sixteenth Section of Lieu Lands in *Papasan*. Thus, dismissal of plaintiffs' equal protection challenge to Kansas' provision of low enrollment weighting is not appropriate.

The local option budget, however, is analogous to the challenged scheme discussed in *Rodriguez*. According to plaintiffs' complaint, the alleged disparities created by the local option budgets is attributed to the varying wealths of the areas. Dismissal is therefore warranted because it is not the "constitutional prerogative" of the federal courts "to nullify statewide measures for financing public services merely because the burdens or benefits thereof fall unevenly depending upon the relative wealth of the political subdivision in which citizens live." *Rodriguez*, 411 U.S. at 54, 93 S.Ct. at 1307–08. Therefore, plaintiffs' equal protection and due process claims are not dismissed. However, their claims are limited to a challenge of Kansas' provision for low enrollment weighting.

### The Tenth Amendment

Defendants' last argument is that the Tenth Amendment of the United States Constitution bars the relief sought by plaintiff. Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Supreme Court interprets the amendment to mean if an authority to act has been delegated by the Constitution to Congress, then Congress may act pursuant to Article I; if not, the power is reserved to the states. *See New York v. United States*, 505 U.S. 144, 156, 112 S.Ct. 2408, 2417, 120 L.Ed.2d 120 (1992); *Kansas v. United States*, 214 F.3d 1196, 1198 (10th Cir.2000).

With this simple statement concerning Tenth Amendment jurisprudence, the court is confused by defendants' argument. Although defendants cite to two recent Supreme Court decisions in which a state challenged a federal statute, (Doc. 15 at 30–31) (citing *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (Low–Level Radioactive Waste Policy Act) and *Printz v. United States*,

521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (Brady Act)), defendants' argument is that "[a]n Order by a federal *judge* to a legislature of a sovereign state to revise a law is 'fundamentally incompatible with our constitutional system of dual sovereignty.'" (Doc. 15 at 32) (emphasis added). If it is indeed defendants' position that this federal court is without constitutional authority to order state officials to comply with federal law, the court firmly disagrees.

In *Puerto Rico v. Branstad*, 483 U.S. 219, 107 S.Ct. 2802, 97 L.Ed.2d 187 (1987), the Supreme Court stated:

> [i]t has long been a settled principle that federal courts may enjoin unconstitutional action by state officials. See *Ex parte Young*, 209 U.S. 123, 155–156, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908). It would be superfluous to restate all the occasions on which this Court has imposed upon state officials a duty to obey the requirements of the Constitution, or compelled the performance of such duties; it may suffice to refer to *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

*Id.* at 228, 107 S.Ct. at 2808. Even in one of the cases cited by defendants, the Supreme Court again stated what it must have believed to be axiomatic:

> the text of the Constitution plainly confers this authority on the federal courts, the "judicial Power" of which "shall extend to all Cases, in Law and Equity, arising under this Constitution, [and] the Laws of the United States ...; [and] to Controversies between two or more States; [and] between a State and Citizens of another State." U.S. Const., Art. III, § 2. The Constitution contains no analogous grant of authority to Congress. Moreover, the Supremacy Clause makes federal law paramount over the contrary positions of state officials; the power of federal courts to enforce federal law thus presupposes some authority to order state officials to comply.

*New York v. United States*, 505 U.S. 144, 179, 112 S.Ct. 2408, 2430, 120 L.Ed.2d 120 (1992). Defendants' argument fails.

If the court were to read defendants' brief with an exceptionally liberal eye, it could possibly read a Tenth Amendment challenge to Congress's enactment of Title VI and the Rehabilitation Act. Defendants only fleetingly mention such an idea in the middle of their Eleventh Amendment argument. *See* Doc. 15 at 10 ("Congress has also been prohibited from commandeering state officials to manage and administrate expansive federal regulatory schemes." (citing *Printz* )); Doc. 15 at 15 ("The similarities between the Brady Act in *Printz* and the Rehabilitation Act are striking"). If defendants were indeed attempting to make such an argument, it fails nevertheless because, as explained above, both Title VI and the Rehabilitation Act were enacted pursuant to Congress's authority under the Spending Clause. *See Kansas v. United States*, 214 F.3d 1196, 1202 (10th Cir. 2000) (stating *Printz* not persuasive to state's challenge to federal act enacted pursuant to Spending Clause). As the Tenth Circuit explained in *Kansas v. United States*, the Tenth Amendment and the Spending Clause "are essentially mirror images of each other: if the authority to act has been delegated by the Constitution to Congress, then it may act pursuant to Article I; if not, the power has been reserved to the states by the Tenth Amendment." *Id.* at 1198 (citing *New York v. United States*, 505 U.S. 144, 156, 112 S.Ct. 2408, 2417, 120 L.Ed.2d 120 (1992)).

### CONCLUSION

In conclusion, defendants have failed to come forward with any argument warranting dismissal of any of plaintiffs' claims with the specific exception that plaintiffs' Fourteenth Amendment challenge is limited to a challenge of low enrollment weighting. The litigation may proceed. Plaintiffs must file a motion to amend their complaint in accordance with this opinion

**1152**

no later than 10 days from the filing of this opinion.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. *Comeau v. Rupp*, 810 F.Supp. 1172 (D.Kan.1992). Any motion for reconsideration shall be limited to five double-spaced pages. A response shall be similarly limited. No reply may be filed.

IT IS THEREFORE ORDERED BY THE COURT that defendants' motions to dismiss (Docs. 12 and 14) are DENIED.

IT IS SO ORDERED.